UTAH PUBLIC SERVICE COMMISSION *v.*
EL PASO NATURAL GAS CO. ET AL.

No. 776.   Argued April 29, 1969.—
Decided June 16, 1969.

*Vernon B. Romney,* Attorney General of Utah, argued the cause and filed a brief for appellant.

*Leon M. Payne* argued the cause and filed a brief for appellee El Paso Natural Gas Co. *Richard B. Hooper* argued the cause for appellees Cascade Natural Gas Corp. et al. With him on the brief were *Robert L. Simpson, John W. Chapman, Robert M. Robson,* Attorney General of Idaho, *Larry D. Ripley, Robert Y. Thornton,* Attorney General of Oregon, *Richard W. Sabin, Slade Gorton,* Attorney General of Washington, and *Robert E. Simpson. John F. Sonnett* argued the cause for appellee Colorado Interstate Corp. With him on the brief were *Raymond L. Falls, Jr.,* and *H. Richard Schumacher. Iver E. Skjeie,* Deputy Attorney General, argued the cause for appellee the State of California. With him on the brief was *Thomas C. Lynch,* Attorney General. *Solicitor General*

*Griswold* argued the cause and filed a memorandum for the United States, at the invitation of the Court. *William M. Bennett* argued the cause and filed a brief *pro se.*

Briefs of *amici curiae* were filed by *David K. Watkiss* and *James D. McKinney, Jr.,* for the Colonial Group, and by *John J. Flynn* and *I. Daniel Stewart, pro se.*

MR. CHIEF JUSTICE WARREN delivered the opinion of the Court.

This is before us on appellant's motion to dismiss its appeal under Rule 60. Ordinarily parties may by consensus agree to dismissal of any appeal pending before this Court.[1] However, there is an exception where the dismissal implicates a mandate we have entered in a cause.[2] Our mandate is involved here. We therefore ordered oral argument at which all parties concerned were afforded an opportunity to be heard on the question whether there had been compliance with the mandate. 394 U. S. 970. At the oral argument a number of appellees supported appellant's motion. They included the United States, the State of California, El Paso Natural Gas Company, Cascade Natural Gas Corporation, Intermountain Gas Company, Northwest Natural Gas Company, the Wash-

---

[1] Rule 60 (1) provides:

"Whenever the parties thereto shall, by their attorneys of record, file with the clerk an agreement in writing that an appeal, petition for or writ of certiorari, or motion for leave to file or petition for [an] extraordinary writ be dismissed, specifying the terms as respects costs, and shall pay to the clerk any fees that may be due him, the clerk shall, without further reference to the court, enter an order of dismissal."

[2] It was said by counsel for eight appellees at oral argument: "[W]e do not question this Court's authority to re-examine its mandate and compliance with it. We do urge, however, that your review be confined to the question whether the mandate has been carried out upon the record before this court."

ington Water Power Company, Washington Natural Gas Company, Idaho Public Utilities Commission, Public Utility Commissioner of Oregon, Washington Utilities and Transportation Commission, Colorado Interstate Corporation, Southern California Gas Company, and Southern Counties Gas Company of California. The motion was opposed by John J. Flynn and I. Daniel Stewart, by brief *amicus curiae,* and by William M. Bennett, who appeared for the State of California when the case was last here, *Cascade Natural Gas Corp.* v. *El Paso Natural Gas Co.,* 386 U. S. 129, 131 (1967), and now presents himself, and argued orally, as "consumer spokesman."

This is a Clayton Act § 7 case, 38 Stat. 731, 15 U. S. C. § 18, in which the acquisition of the stock and assets of Pacific Northwest Pipeline Corporation by El Paso Natural Gas Company raised the "ultimate issue" whether "the acquisition substantially lessened competition in the sale of natural gas in California." *United States* v. *El Paso Natural Gas Co.,* 376 U. S. 651, 652. We ordered divestiture "without delay." *Id.,* at 662. That was in 1964. The United States later agreed to settle the case. As to that we said:

> "We do not question the authority of the Attorney General to settle suits after, as well as before, they reach here. The Department of Justice, however, by stipulation or otherwise has no authority to circumscribe the power of the courts to see that our mandate is carried out. No one, except this Court, has authority to alter or modify our mandate. *United States* v. *du Pont & Co.,* 366 U. S. 316, 325. Our direction was that the District Court provide for 'divestiture without delay.' That mandate in the context of the opinion plainly meant that Pacific Northwest or a new company be at once restored to a position where it could compete with El Paso in the California market." 386 U. S., at 136.

We set aside that consent decree and remanded for additional findings and a new solution, saying:

"In the present case protection of California interests in a competitive system was at the heart of our mandate directing divestiture. For it was the absorption of Pacific Northwest by El Paso that stifled that competition and disadvantaged the California interests. It was indeed their interests, as part of the public interest in a competitive system, that our mandate was designed to protect." *Id.,* at 135.

On remand the District Court decided it should choose from among the various applicants the one that is "best qualified to make New Company a serious competitor" in the California market. That court chose Colorado Interstate Corp., the only gas pipeline operator among the various applicants.

Under the plan approved by the District Court, El Paso receives 5,000,000 shares of New Company nonvoting preferred stock, convertible into common stock at the end of five years. What the conversion ratio will be is not known; but, it is said, there will be provisions to restrict El Paso control over the New Company. The New Company also assumes approximately $170,000,000 of El Paso's system-wide bond and debenture indebtedness, an amount designated the Northwest Division's pro-rata share of that indebtedness.

Utah's jurisdictional statement, which she now moves to dismiss, was filed here November 25, 1968. That jurisdictional statement presents the question whether the decree entered below satisfies our mandate. It is the filing of that jurisdictional statement that brings the question here. See *United States* v. *du Pont & Co.,* 366 U. S. 316. In fact, in its jurisdictional statement, Utah urged that the decree does not meet the requirements of

*du Pont.* We thus need not decide whether the papers filed by *amicus curiae* or Mr. Bennett properly presented the question of compliance. We find that the decree of the District Court does not comply with our mandate: it does not apportion the gas reserves between El Paso and New Company in a manner consistent with the purpose of the mandate, and it does not provide for complete divestiture. We therefore vacate the judgment and remand the case for further proceedings.

## I.

When the case was last here we said, "The gas reserves granted the New Company must be no less in relation to present existing reserves than Pacific Northwest had when it was independent; and the new gas reserves developed since the merger must be equitably divided between El Paso and the New Company. We are told by the intervenors that El Paso gets the new reserves in the San Juan Basin—which due to their geographical propinquity to California are critical to competition in that market. But the merged company, which discovered them, represented the interests both of El Paso and of Pacific Northwest. We do not know what an equitable division would require. Hearings are necessary, followed by meticulous findings made in light of the competitive requirements to which we have adverted." 386 U. S., at 136–137.

The District Court awarded 21.8% of the San Juan Basin reserves to the New Company saying that was "no less in relation to present existing reserves" than Northwest had when it was independent. The District Court also gave the New Company more than 50% of the net additions to the reserves developed since the merger. Concededly the total reserves of the New Company will not be sufficient to meet the old Northwest's existing requirements and those of a California project.

This attempt to paralyze competition in the California market started years ago; the Clayton Act suit was filed in 1957. The record up to the entry of the present decree shows, as the District Court found, that delay has strengthened El Paso's position. *First,* the delay has strengthened El Paso's hold on the California market, making it more and more difficult for a new out-of-state supplier to enter. *Second,* an additional out-of-state supplier has entered the California market during this 12-year period, taking what well might have been the place of the old Northwest Company had not its competition been stifled. *Third,* permits for new pipelines from Texas to California are now pending before the Federal Power Commission.

The purpose of our mandate was to restore competition in the California market. An allocation of gas reserves should be made which is "equitable" with that purpose in mind. The position of the New Company must be strengthened and the leverage of El Paso not increased. That is to say, an allocation of gas reserves—particularly those in the San Juan Basin—must be made to rectify, if possible, the manner in which El Paso has used the illegal merger to strengthen its position in the California market. The object of the allocation of gas reserves must be to place New Company in the same relative competitive position *vis-à-vis* El Paso in the California market as that which Pacific Northwest enjoyed immediately prior to the illegal merger.

A reallocation of gas reserves under this standard may permit an applicant other than Colorado Interstate Corporation to acquire New Company and make it a competitive force in California. Thus, the District Court is directed to effect this reallocation of gas reserves, and, in light of the reallocation, to reopen consideration of which applicant should acquire New Company. Such

consideration should, of course, include whether an award to a particular applicant will have any anti-competitive effects either in the California market or in other markets.

## II.

Our mandate directed complete divestiture. The District Court did not, however, direct complete divestiture. Neither appellant nor any party supporting the dismissal argues that the District Court did so. Rather they argue that the disposition made by the District Court was the best that might be made without complete divestiture. Clearly this does not comply with our mandate. *United States* v. *du Pont & Co.*, 366 U. S. 316, was another § 7 case in which we ordered "complete divestiture." *Id.*, at 328. One plan proposed was a distribution of General Motors shares held by du Pont, most of them to be distributed *pro rata* over a 10-year period to du Pont stockholders; the rest were to be sold gradually over the same 10-year period. *Id.*, at 319–320. Du Pont's alternate plan was to retain all attributes of ownership, passing through to its shareholders the voting rights proportional to their holdings of du Pont shares. We did not approve that plan but directed "complete divestiture." *Id.*, at 334. We said: "The very words of § 7 suggest that an undoing of the acquisition is a natural remedy. Divestiture or dissolution has traditionally been the remedy for Sherman Act violations whose heart is intercorporate combination and control." 366 U. S., at 329. We said that divestiture only of voting rights was not an adequate remedy. What was necessary was dissolution "of the intercorporate community of interest which we found to violate the law." *Id.*, at 331.

The reason advanced for allowing El Paso to take a stock interest in the New Company rather than cash is to reduce its income tax burden. We have emphasized

that the pinch on private interests is not relevant to fashioning an antitrust decree, as the public interest is our sole concern. *United States* v. *du Pont & Co., supra,* at 326.

The same reasoning is applicable to the present case. Retention by El Paso and its stockholders of the preferred stock is perpetuation to a degree of the illegal intercorporate community. Assumption of $170,000,000 of El Paso's indebtedness helps keep the two companies in league. The severance of all managerial and all financial connections between El Paso and the New Company must be complete for the decree to satisfy our mandate. Only a cash sale will satisfy the rudiments of complete divestiture.

We vacate the judgment of the District Court and remand the cause for proceedings in conformity with this opinion.

*It is so ordered.*

MR. JUSTICE WHITE and MR. JUSTICE MARSHALL took no part in the consideration or decision of this case.

MR. JUSTICE HARLAN, whom MR. JUSTICE STEWART joins, dissenting.

The action taken by the Court today will be dismaying to all who are accustomed to regard this institution as a court of law.

All semblance of judicial procedure has been discarded in the headstrong effort to reach a result that four members of this Court believe desirable. In violation of the Court's rules, the majority asserts the power to dispose of this case according to its own notions; despite the fact that all the parties participating in the lower court proceedings are satisfied that the District Court's decree is in the public interest. The majority seeks to justify this extraordinary step on the ground that District Judge

Chilson's painstaking opinion of over 30 pages is in violation of the mandate issued in *Cascade Natural Gas Corp.* v. *El Paso Natural Gas Co.,* 386 U. S. 129 (1967), although (1) we have heard no oral argument directed to this question [1] and (2) we have not ordered the interested parties to file full briefs on this issue. Actually, as will appear, what the Court has done is to substitute, *sua sponte,* a new mandate for its old one. I cannot possibly subscribe to such an abuse of the judicial process.

Moreover, even if the impropriety of the Court's precipitate course is swallowed, it seems to me clear that the District Court's decision in the present case did not violate any prior mandate this Court has entered in this long and complicated litigation.[2] Rather than frustrat-

---

[1] The Court's opinion incorrectly states that we "ordered oral argument at which all parties concerned were afforded an opportunity to be heard on the question whether there had been compliance with the mandate." *Ante,* at 466. The complete text of the Court's order directing a hearing unequivocally shows that the parties were requested to address themselves only to the motion filed by the State of Utah requesting permission to dismiss its appeal and that the parties were not asked to argue the merits of the appeal:

"The motion of appellant to dismiss the appeal under Rule 60 and the motion of William M. Bennett for a hearing are set for oral argument on April 29, 1969. The Solicitor General is invited to file a brief and present oral argument if he so desires. MR. JUSTICE HARLAN and MR. JUSTICE STEWART dissent, believing that the action taken by the Court abuses its own processes. See Rule 60. MR. JUSTICE WHITE, MR. JUSTICE FORTAS, and MR. JUSTICE MARSHALL took no part in the consideration or decision of this matter." 394 U. S. 970 (1969).

Pursuant to the Court's order, the parties used their limited time for oral argument in an effort to satisfy the Court that they had acted properly in refusing to take an appeal from the District Court's decision. No party presented any substantial arguments on the merits of this case.

[2] See *Cascade Natural Gas Corp.* v. *El Paso Natural Gas Co., supra; United States* v. *El Paso Natural Gas Co.,* 376 U. S. 651 (1964); cf. *California* v. *Federal Power Commission,* 369 U. S. 482 (1962).

ing *Cascade*'s command that "a new company be at once restored to a position where it could compete with El Paso in the California market," 386 U. S., at 136, Judge Chilson's decree adopted the solution which, so far as one can now tell, most effectively realized the goals of § 7 of the Clayton Act. Indeed, it is unlikely that as a result of the Court's order today, California's natural gas consumers will ever obtain the benefits of competition that this lawsuit was intended to achieve when it was initiated by the Department of Justice in 1957.

## I.

In addition to 17 private parties, the States of California, Arizona, Nevada, Utah, and Washington intervened in the proceedings below. The Department of Justice of course represented the interests of the United States as plaintiff, and the Federal Power Commission participated as *amicus curiae*. Only the State of Utah, however, chose to file a Jurisdictional Statement in this Court challenging Judge Chilson's decree. All other parties have signified their belief that the District Court's judgment is satisfactory. The State of Utah now wishes to dismiss its appeal, reasonably suggesting that its interests in the present dispute are peripheral, and that if the State of California and the United States do not believe that the decree will prejudice the interests of California's consumers, Utah considers it inappropriate to contest the matter further.

The majority, however, refuses to permit Utah to dismiss its appeal, despite the command of Rule 60 of the rules of this Court:

> "*Whenever* the parties thereto shall, by their attorneys of record, file with the clerk an agreement in writing that an appeal, petition for or writ of certiorari, or motion for leave to file or petition for [an]

extraordinary writ be dismissed, specifying the terms as respects costs, and shall pay to the clerk any fees that may be due him, the clerk *shall, without further reference to the court, enter an order of dismissal."* (Emphasis supplied.)

The language of the rule could not be clearer—the parties to a lawsuit are given the absolute right to dismiss their appeal without judicial scrutiny. Since 1858, the rules of this Court have expressly recognized the existence of this right, see Revised Rules of the Sup. Ct. of the United States, Rule No. 29 (1858),[3] and I have found no decision in which this right has ever been questioned or limited. Nevertheless, the Court today, without any discussion whatever, ignores the heretofore unquestioned interpretation of the rule and declares that "there is an exception where the dismissal implicates a mandate we have entered in a cause." *Ante,* at 466.

In handing down this *ipse dixit,* the Court not only overlooks the teachings of more than a century of judi-

---

[3] Rule 29 provided:

"Whenever the plaintiff and defendant in a writ of error pending in this court, or the appellant and appellee in any appeal, shall at any time hereafter, in vacation and out of term time, by their respective attorneys, who are entered as such on the record, sign and file with the clerk an agreement in writing, directing the case to be dismissed, and specifying the terms upon which it is to be dismissed as to costs, and also paying to the clerk any fees that may be due to him, it shall be the duty of the clerk to enter the case dismissed, and to give to either party which may request it a copy of the agreement filed; but no mandate or other process is to issue without an order by the court."

While this rule by its terms provided for dismissal of cases only during vacation, there is no indication that a different procedure was followed during the Term. Surely there would be little reason to permit automatic dismissal during vacation but forbid it at other times.

Rule 29, with minor amendments, was a part of the Court's rules until July 1, 1954, when it was replaced by the present Rule 60.

cial practice, but also undermines the basic policies which support Rule 60. The rule is not a mere technicality but is predicated upon the classical view that it is the function of this Court to decide controversies between parties only when they cannot be settled by the litigants in any other way. See *Marbury* v. *Madison,* 1 Cranch 137 (1803). On this view of the judicial process, it is difficult to perceive why the Court should feel constrained to enforce its mandate when the parties have subsequently agreed, in a completely voluntary and bona fide way, that a different solution will better accommodate their interests. We have labor enough in deciding those pressing disputes which the parties are unable to resolve; there is no need to "do justice" when no litigant is complaining that a wrong has been committed. Nor will it do to say, as the Court seems to suggest, that antitrust decrees, being affected with a public interest, as they surely are, are always subject to *sua sponte* enforcement by the Court. "Enforcement" of the laws of the United States is the province of the Executive Branch. It is no more a proper function of this Court to thwart the Department of Justice when it decides to terminate an antitrust litigation than it is to order this department of the Executive Branch to commence an antitrust case which some members of this Court may feel should be brought.[4]

Although the Court's decision to police its own mandates *sua sponte* thus offends fundamental conceptions

---

[4] It is of course perfectly appropriate for a court to make an independent judgment as to the merits of an antitrust consent decree which the parties submit for approval. See, *e. g., United States* v. *Pan American World Airways, Inc.,* 1959 Trade Cas. ¶ 69,300, at 75,138 (D. C. S. D. N. Y.). For in the consent decree context, the parties are requesting affirmative action from the judiciary in order to resolve their dispute, while in the situation we confront, none of the parties are requesting further judicial relief.

of the judicial process, I do not mean to suggest that this Court lacks the *constitutional* power to act in the way it has done. Cf. *Continental Co.* v. *United States,* 259 U. S. 156, 165–166 (1922). The Court does have a legitimate interest in maintaining the integrity of its mandates within the entire judicial system and it may be argued that the lower courts will not conscientiously effectuate our decisions unless all know that the Court will act when it learns of abuses. Yet, although this argument may be enough to establish the constitutionality of a practice in which this Court sits as an investigatory body with a roving commission to travel the length and breadth of this land policing its mandates, Rule 60 indicates that such an extraordinary departure from traditional judicial norms has never been thought necessary to insure the integrity of our mandates. Even during periods of history in which there was a greater risk that lower courts would seek to frustrate our decisions, it has been considered sufficient to rely upon the parties to bring violations of a mandate to our attention either by prosecuting a second appeal or by petitioning for a writ of mandamus.[5]

I see no reason why we should turn our back on such basic traditions at this late date. Moreover, if we are to take such drastic action, surely we should not do so in an *ad hoc* manner, under the pressures of the closing days of the Term. Rather, if we are to change Rule 60, we should do so in an appropriate rule-making proceeding, in which the arguments on both sides of the question may be canvassed with the dispassionate neutrality that is appropriate.

---

[5] See *In re Potts,* 166 U. S. 263 (1897); cf. *In re Sanford Fork & Tool Co.,* 160 U. S. 247 (1895); *Ex parte The Union Steamboat Co.,* 178 U. S. 317 (1900).

For all of these reasons, I would grant Utah's motion to dismiss its appeal and put an end to this 12-year-old lawsuit.[6]

## II.

It is with great hesitation that I turn to consider the Court's decision finding Judge Chilson's decree in violation of *Cascade*'s mandate. The case before us is one of enormous complexity. In addition to the plaintiff and defendant, 22 intervenors and nine applicants for the acquisition of the New Company participated in the proceedings below. Judge Chilson heard testimony for more than three months; the record in this case covers more than 14,000 pages, not to mention voluminous exhibits. And yet, we have not received any briefs which even attempt a complete discussion either of the merits of this case or of the question whether our mandate has been followed in a satisfactory way. The Jurisdictional Statement submitted by the State of Utah properly does not suggest that this case is suitable for summary disposition and simply attempts to persuade the Court that the questions presented are substantial. The documents filed in support of Judge Chilson's decision are no more satisfactory. While many of the parties who participated below have tendered motions in support of Utah's request to dismiss its appeal, these papers principally discuss the reasons why each party was satisfied with the result reached below and do not attempt a full-scale analysis of the merits of this extended and complicated controversy. Only the Mem-

---

[6] The Court does not decide whether the papers opposing Utah's motion to dismiss which were presented by John J. Flynn and I. Daniel Stewart, as *amicus curiae,* and those tendered by William M. Bennett, as "consumer spokesman," may be properly considered at this late stage in the proceedings. Since the Court does not reach this question, I do not believe it appropriate to state my views on the matter; nor have I believed it proper to consider in any way the arguments made by Messrs. Flynn, Stewart, and Bennett.

orandum submitted by the Solicitor General deals with the substance of the case in any significant way, since it contains the Government's Motion to Affirm which had been prepared as an answer to Utah's Jurisdictional Statement. Yet the Government's 18-page document does not pretend to deal thoroughly with this case's factual intricacies.

Despite the inadequate briefing, however, enough emerges from the record to suggest that, far from disobeying *Cascade*'s mandate, Judge Chilson made a decision which may well be the only one which realistically promises to fulfill the purposes of the Clayton Act.

The District Court found that "time is of the essence" if the New Company is to compete successfully in the California market. 291 F. Supp. 3, 28. Judge Chilson's analysis of the competitive situation existing today powerfully supports his conclusion that the chances of successful entry are becoming more remote with every passing year. The District Court noted that when this lawsuit began in 1957, El Paso was the only out-of-state supplier in the California market; in contrast, two additional strong companies have entered the State in the past decade. Moreover:

> "Although the expanding California market appears to offer opportunities for New Company to enter the market, the recommendation of the Federal Power Commission staff that a 42-inch pipeline should be constructed to California is a matter of grave concern, for according to the evidence before the Court, a 42-inch line would serve all increments to the southern California market for the foreseeable future. The Supreme Court recognized that competition in the California market is limited to future increments, which have not yet been certified for service. Once an increment has been certified, it is withdrawn from competition. The recommenda-

tions of the Commission's staff for the construction of a 42-inch line have been commended by the FPC examiner in a current proceeding as 'bold and constructive.'. . .

.     .     .     .     .

"The Government . . . [in] its Brief . . . states: 'It is too early to predict the ultimate direction or final outcome of this current FPC proceeding. The opportunity it presents to the new company which is to emerge from this law suit is evident. If a full scale 42-inch proceeding gets underway . . . the new company should be equipped to enter as a contender with at least the minimum qualifications for serious consideration.' " 291 F. Supp., at 27–28.

The District Court found that the Colorado Interstate Gas Company (CIG) was the only potential purchaser which had a real opportunity to convince the FPC that it should operate the new Texas pipeline that holds the key to successful competition in California. Surely this finding has a substantial basis in fact, since no other prospective purchaser of the New Company has ever operated a pipeline and only one has ever had any connection at all with the oil and gas industry. Nevertheless, the Court today substantially decreases the chances of successful competition by the New Company by requiring years more litigation before the day will come when operations finally commence. During this lengthy period, existing gas companies will become even more solidly entrenched in the market and the Texas pipeline proceeding may well have progressed to the point where the New Company could not obtain serious consideration from the FPC.

Despite the fact that the Clayton Act may well be the loser, the majority prolongs this lawsuit for two reasons. First, it is said that the District Court violated *Cascade*'s requirement that "[t]he gas reserves granted the New

Company must be no less in relation to present existing reserves than Pacific Northwest had when it was independent; and the new gas reserves developed since the merger must be equitably divided between El Paso and the New Company." 386 U. S., at 136–137. But the Court's own discussion of this question unmistakably demonstrates that Judge Chilson fully complied with this branch of *Cascade*'s mandate. The Court cannot and does not deny that Judge Chilson granted reserves to the New Company which are " 'no less in relation to present existing reserves' than Northwest had when it was independent." See *ante,* at 469. The only question that remains is whether the District Court decreed an "equitable" division of gas resources discovered since the merger. The answer to this question also seems quite easy, since the Court does not deny that Judge Chilson granted New Company about 50% of these reserves, which is much more than its proportionate share of the assets.

Although this equal division seems more than equitable to the New Company, the majority fastens on the fact that even with this distribution of resources, the New Company will not be assured of sufficient gas both to meet the anticipated demand of New Company's present customers in the Pacific Northwest and to satisfy the requirements of its potential customers in the California market. This indeed would be a source of concern if it were found that New Company could not practically obtain additional gas resources if it decides to compete in California. But Judge Chilson concluded that just the opposite situation obtains; the District Court found that the New Company "can obtain the reserves necessary to compete in the California market." 291 F. Supp., at 20. The Court, however, ignores this finding completely and does not even attempt to show how, given this fact, New Company's equal share of reserves can

in any sense be called "inequitable." Indeed, it is perfectly clear that the Court, under the guise of enforcing its mandate, is really creating a new, and more stringent, standard by which to test this divestiture. But surely this is completely illegitimate in a case where no party has challenged the legality of the District Court's decision, and where, at the most, the issue is the lower court's compliance with our previous mandate.

The Court's second ground for claiming disobedience with *Cascade*'s command is equally untenable. It is said that *Cascade* ordered "complete divestiture" without delay and we are told that no divestiture can be complete unless there is a cash sale. Since the trial court did not order a cash sale, the majority finds that *Cascade*'s mandate has not been obeyed.

There are several things wrong with this line of argument. First, *Cascade* expressly states that a cash sale is *not* required under the standards it sets down:

> "Disposition of all of the stock *with all convenient speed* is necessary and conditions must be imposed to make sure that El Paso interests do not acquire a controlling interest." 386 U. S., at 141. (Emphasis supplied.)

Since *Cascade* did not require a cash sale it is difficult to see how the present divestiture plan, in which all the common stock of the New Company is transferred to CIG is a *per se* violation of this Court's earlier mandate. Once again, the Court has created a new standard for judging the validity of the District Court's decision instead of limiting itself to a consideration of whether the decree fulfilled *Cascade*'s demand "that El Paso interests do not acquire a controlling interest" in the New Company.

I pass, then, to consider whether the divestiture plan before us violates our mandate in permitting El Paso

domination of its competitor. While this standard is a rather vague one, MR. JUSTICE DOUGLAS, speaking for the Court in *Cascade,* gave it specific content by explaining why the proposed terms of divestiture then under review were unsatisfactory. This explanation is of the highest importance in determining whether Judge Chilson's decree contravened *Cascade*'s command and it must be considered with care. MR. JUSTICE DOUGLAS began his analysis by noting that the decree had taken some steps to insulate the New Company from El Paso control since it did bar El Paso officers, directors, and owners of more than one-half of one percent of El Paso stock from buying into New Company at the public offering. The Court, however, found this limitation insufficient because:

"the decree does not prohibit members of the families of such prohibited purchasers from obtaining New Company stock. Further, under the terms of the decree, it would be possible for a group of El Paso stockholders, each with less than one-half of one percent of El Paso stock, to acquire at the initial public offering enough New Company stock substantially to influence or even to dominate the New Company. Or, such a group could combine with the families of prohibited purchasers in order to control the New Company. After the exchange or public offering, there is no restriction on the number of New Company shares El Paso shareholders may acquire. Thus, there is a danger that major El Paso stockholders may, subsequent to the exchange or public offering, purchase large blocks of New Company stock and obtain effective control." 386 U. S., at 140–141.

Judge Chilson's decree took steps to remedy each and every defect MR. JUSTICE DOUGLAS noted in *Cascade.* No members of the immediate family of any officer,

director, or owner of one-half of one percent of El Paso shares may convert their nonvoting preference shares into voting common shares at any time. Moreover, any person who acts in concert with any director, officer, or substantial owner of El Paso is included within the ban. In addition, these same individuals are not permitted to obtain control of significant proportions of CIG stock, thereby achieving control over the New Company indirectly. Officers, directors, and their associates are barred from owning more than one-tenth of one percent of CIG stock during the next 10 years and substantial owners of El Paso may not own more than 5% of the outstanding common stock of CIG.[7]

It may be that, on appeal, even these stringent conditions may not be found to have fully satisfied the purposes of the Clayton Act. A decision of this question would of course require an analysis of the financial structure of El Paso in order to determine whether it was possible for the Company or its owners to evade the conditions imposed upon them. But it is surely impossible to hold on this record that Judge Chilson's decree is a violation of the mandate issued in *Cascade* when the present divestiture plan manifests a conscientious effort to comply with all of the suggestions advanced

---

[7] These conditions were approved by the District Court on November 7, 1968, in an order approving the Implementing Documents filed by the appropriate parties pursuant to Judge Chilson's decision naming CIG as the successful applicant. The Implementing Documents are a part of the record in this case.

In addition to the restrictions mentioned in the text, the District Court also forbade El Paso's officers and directors as well as their associates, from owning more than one-tenth of one percent of New Company stock for the next 10 years; moreover, El Paso and its affiliates are forbidden to acquire any New Company or CIG stock at any time in the future. Steps have also been taken to assure that El Paso will have no officers or directors in common with New Company or CIG.

by the Court in that opinion.[8]  Indeed, the majority today does not even attempt to make such a claim.  Instead, it ignores the fact that the District Court carefully framed conditions to assure the New Company's independence.  At no point in its brief opinion does the Court analyze this aspect of Judge Chilson's decree, contenting itself with the cryptic comment that "it is said . . . [that] there will be provisions to restrict El Paso control over the New Company."  *Ante,* at 468.

### III.

The Court's conclusion that its mandate has been disobeyed is, in short, based upon completely erroneous factual premises born of a superficial acquaintance with this 14,000-page record.  This is not surprising since the majority has seen fit to decide this important case without the benefit of significant oral or written argument.  And yet it is upon this tenuous basis that the Court has chosen to shatter centuries of judicial tradition in order to reach a decision which does not even promise to further the interests of California's gas consumers.

What eventuates today evinces a course of unjudicial action that transcends even that which marked the last appearance of the case in this Court.  See the dissenting opinion of STEWART, J., in *Cascade,* 386 U. S. 129, 143.

I respectfully dissent.

---

[8] The Court relies heavily on *United States* v. *du Pont & Co.,* 366 U. S. 316 (1961), to support its claim that *Cascade's* mandate has been breached.  But *du Pont* only holds that the District Court must assure itself that "the intercorporate community of interest which we found to violate the law" must be dissolved by divestiture. 366 U. S., at 331.  Nothing in *du Pont* suggests, let alone holds, that a cash sale is the only way to accomplish this objective.  Like *Cascade, du Pont* established no *per se* rule in this area.