**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA**

**v.**

**DISTRICT 50, UNITED MINE WORK-ERS OF AMERICA, a/k/a International Union of District 50, United Mine Workers of America, Appellant.**

**INTERNATIONAL UNION, UNITED MINE WORKERS OF AMERICA**

**v.**

**DISTRICT 50, UNITED MINE WORK-ERS OF AMERICA, a/k/a International Union of District 50, United Mine Workers of America, et al., Appellants.**

**Nos. 23127–23129.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 29, 1969.

Decided Aug. 17, 1970.

As Amended Oct. 21, 1970.

Petition for Rehearing denied Nov. 6, 1970.

Mr. Joseph C. Wells, Washington, D. C., with whom Messrs. Jack H. Weiner and Alfred D. Treherne, Washington, D. C., were on the brief, for appellants.

Mr. Walter E. Gillcrist, Washington, D. C., with whom Messrs. Edward L. Carey, Harrison Combs, Washington, D. C., Willard P. Owens and Miss Suzanne V. Richards, were on the brief, for appellee.

Before BAZELON, Chief Judge, and WRIGHT and LEVENTHAL, Circuit Judges.

LEVENTHAL, Circuit Judge.

This litigation began with what seens on the surface a traditional action on a

promissory note, differing from other such actions, perhaps, in the size of the note—$8,000,000—and in the fact that both obligor and payee on the note when executed, in 1962, were labor unions identified with the United Mine Workers of America. The plaintiff payee is the International Union, United Mine Workers of America, which will be referred to variously as United Mine Workers, and UMW. The defendant obligor, District 50 of the United Mine Workers, offered the defense that the note is unenforceable because of the circumstances which led to its execution.

At the same time the note was executed, the parties signed an affiliation agreement which contained a licensing provision whereby District 50 was allowed to continue using the words "United Mine Workers of America" as part of its name. In 1968 the UMW exercised its rights under the termination clause permitting either party to terminate the agreement on thirty days' notice. District 50 continued to use the words "United Mine Workers of America" in its title. When plaintiff sued on the note it also filed an action for an injunction against the use by District 50 of the Mine Workers name. District 50 counterclaimed with a demand for an accounting for all of the funds which the United Mine Workers had received from District 50 since its establishment.

The District Court rejected the defenses of fraud and coercion raised by District 50, granted judgment to plaintiff United Mine Workers on the note and on its request for an injunction, and dismissed District 50's counterclaim. This case is moot as to the injunction since after taking the appeal District 50 started using another name.[1] In our view the District Court failed to take proper account of the circumstances surrounding the execution of the note and the name-licensing affiliation agreement. We reverse the judgment on the note and order the action dismissed. We affirm the District Court's judgment dismissing District 50's counterclaim.

I

The roots of the present controversy extend back to the 1930's. In 1935 the United Mine Workers Union was a member of the AFL, and the UMW charter restricted membership to persons "employed in and around coal mines, coal washeries and coke ovens on the American Continent." In late 1935, John L. Lewis, President of the UMW, resigned from his position as Vice President of the AFL, the UMW withdrew from the AFL, and shortly thereafter the UMW constitution was amended to extend membership not only to those previously eligible, but also persons "in such other industries as may be designated and approved by the International Executive Board." The general purpose of this move was stated as protecting the UMW from "raids" by AFL unions and other unions which might be established in coal-related areas and which might seek to expand membership into the coal-mining area itself.

Accordingly, in September 1936, the UMW chartered District 50, and established its membership as including, for example, gas and chemical workers. However, District 50 was formed as a "provisional" district, and was subject to the jurisdiction of the UMW. Its charter provided that it was to "acquire no rights in the funds, or to participate in the elections or conventions of the United Mine Workers of America." Instead, District 50 was to have its "own autonomy with respect to * * * elections, conventions and wage negotiations." District 50 and its members were required to make payments to the parent UMW.[1a] The officers of District

---

1. "The International Union of District 50, Allied and Technical Workers of the United States and Canada."

1-a. Technically the members of District 50 paid dues to District 50, and District 50 paid an affiliation fee, a per capita tax, to the United Mine Workers. There was no payment of dues to UMW direct by members of District 50.

50, including Kathryn Lewis as Secretary-Treasurer, were appointed and paid by the United Mine Workers.

From the time of its inception, District 50 received funds from the parent UMW for organizational and other purposes. The transfers were always designated as "loans." The dues assessed against members of District 50 were lower than those assessed against regular UMW members, chiefly because it was desired to make District 50 membership as attractive as possible to those persons who were eligible to join either District 50 or rival AFL unions. There was no significant rival-union threat to the remainder of the UMW.

In 1941, the administrative offices of the Provisional District 50 were placed in charge of an Organizing Committee representing the UMW. This followed a report by John L. Lewis to the UMW Executive Board, advising that District 50 had an organization of substantial proportions, built at "nominal" cost beyond the fact that per capita tax "has been substantially plowed back unto organizational purposes." He called for an expansion of organization. The Organizing Committee pressed organization vigorously and in diverse fields. In 1942, the United Construction Workers was accepted into District 50 membership as an affiliate. District 50 organized a Dairy Farmers Division, in 1942, and a Railroad Workers Division, in 1942–1943.

In 1944, the UMW officers reported to the UMW Convention on these facts, and placed them in a setting, beginning in 1942, wherein District 50 and UMW were in conflict with a dual union sponsored by the CIO. "In face of active opposition, not only from employers, labor organizations, government bureaus and officials of the administration, of high and low degree, apparently intended to undermine and destroy the International Union [UMW] through an attack which was centered on District 50, it has continued to make substantial progress." That progress was reported by noting that District 50 bargaining contracts covered more than 200,000 members, in diverse industries, and that stress was being placed on the chemical industry "of special importance in the post-war adjustment * * * because of its direct relation to the coal industry. It is of importance to every coal miner in the country to do his part in furthering organization in this industry for his own interests as well as for the interests of the organization."

During the 1940s the expenditures of District 50 reached huge dimensions. So also did the checks transmitted by UMW to District 50, all carefully denominated as "loans" in the accompanying correspondence. The exact details are not clear but the sums loaned apparently emerged in the first half of the decade in the range of $1,000,000 per annum. During the first half of 1946, UMW's loans to District 50 totaled $650,000. The pace quickened during the last half of 1946, a period when UMW made loans to District 50 totaling $950,000, as contrasted with loans to all other UMW Districts combined of only $19,200.

Typically, a little over one third of the monthly loan was returned to the UMW in payment of District 50's per capita tax. The remainder was devoted in very large part to organization efforts. The officers and Organizing Committee of District 50 reported to their Fifth Consecutive Convention in September 1946 that "There is no thought of accumulating a treasury while millions seek assistance in organization. Indeed, District 50 has continued annual expenditures substantially in excess of receipts. This has been made possible by assistance from the International Union."

It is incontrovertible that the UMW sponsored and considered itself benefited by the policy of vigorous organizational activities by District 50. At a January 1947 meeting of the UMW International Executive Committee, President John Lewis recommended creation of a new Organizing Committee, as an intermediate agency, to "exercise supervisory jurisdiction over it [District 50] and decide those questions that come up every day as

a matter of routine." Mr. Lewis stated that District 50 was a valuable asset, since it includes the "expanding" chemical industry, while employment in the mining industry will continue to drop with mechanization. He said that he thought it essential "from the standpoint of our organization through the years to come * * * to continue expanding our membership from these collateral industries." He went on to state:

Under these circumstances I think it is essential to keep District No. 50, which is now our largest district in America, as an expanding unit of our organization. District 50 * * * now could, if the organization so decided, maintain themselves as self-supporting districts in the organization. However, that policy would of course curtail, restrict and minimize the organizing activities and prevent the expansion as at [sic] rapid a rate as we would like. So, as long as we are able to do so, I think it well to continue these units as expanding entities taking in new members. * * *

* * * * * *

However, the operation of District 50 costs a substantial sum of money, and, like all organizations, it needs a strict and meticulous attention upon the part of administrative officers of the organization.

A. D. Lewis, brother of John L. Lewis and "Special Representative of the United Mine Workers of America" became Chairman of the new Organizing Committee. The remaining five members of the new Organizing Committee were presidents of other districts of the UMW, and one was a member of the UMW International Executive Board. A. D. Lewis who later became president of District 50, had his salary paid by the UMW until his death in 1962, shortly after the first affiliation agreement between District 50 and the UMW was concluded.

The new Organizing Committee continued the massive organizational and spending policies of District 50, though it was able to trim down the monthly subsidy from the UMW, from $150,000 to $100,000 per month.

Meanwhile the status of District 50 with respect to the UMW maintained its character of "vassalage," as the District Court referred to it. Indeed, on September 21, 1948, when O. B. Allen, appointed Comptroller of District 50 by John L. Lewis on April 22, 1948, reported to A. D. Lewis that the total loan from the International was $9,579,250.00 on July 31, 1948, he added, "This figure was secured from the UMWA as I could not determine a similar figure from District 50's records."

The same general pattern of loans continued through the 1950s. So also did the state of "vassalage." In 1955 A. D. Lewis, who by this time had been appointed president of District 50 following dissolution of the Organizing Committee, and who had, under the Rules of District 50 "general and complete supervision over, and administration of the affairs of the District," wrote to the man who was then general counsel for District 50: "You are aware, as I am, that District 50 lives, breathes and conducts its affairs as an integral part of the UMWA. It is necessary for us to make financial reports, each month, and follow the stated policies of the UMWA at any and all times in conducting our business." Elwood Moffett, later President of District 50 when the 1962 affiliation agreement was signed, stated at the 1959 meeting of the UMW Executive Board that "District 50 is an instrument of the International Union," and added that "we take our advice and instructions from the Officers of the International Executive Board. We always have and we always will."

By 1961 District 50's loans from the UMW had run up to a total of approximately $23,000,000. During the period of its borrowings District 50 had paid to the UMW approximately $14,000,000 in dues. The District Court aptly termed this "an astounding and fantastic method of financing by which the debtor bor-

rowed money from his creditor in order to pay his debt to the creditor."

Meanwhile, events were taking place in Congress which were to require an end to the special relationship that existed between District 50 and the United Mine Workers. Investigations by the McClellan Committee [2] had revealed serious dishonesty and wrongdoing on the part of some labor leaders. Spurred by a strong national concern for reform, Congress undertook closer regulation of labor unions. One of the chief tools chosen to combat exploitation of union members by dishonest leaders was a federally mandated union democracy. The Labor-Management Reporting and Disclosure Act of 1959, 29 U.S.C. §§ 401–531 (1964), popularly called the Landrum-Griffin Act, contained a Labor "Bill of Rights," which extended federal protection to a group of rights which had previously enjoyed only state protection or none at all. Salient was the guarantee to each member of an equal right to vote and participate in elections, referendums, and meetings, subject only to the restrictions contained in reasonable union regulations.[3]

At this time District 50 had almost twice as may members as the rest of the UMW combined. Accordingly, the UMW decided against implementation of the Landrum-Griffin Act by extending full voting rights in the UMW to members of District 50. Instead it decided that District 50 was to become an independent international union. However, it was contemplated that District 50 would be affiliated with the UMW. In 1961 a set of Articles of Affiliation was approved by A. D. Lewis and the Executive Board of District 50 (which had been appointed by the President of the UMW) and by the International Executive Board of the UMW. It acknowledged an indebtedness on the part of District 50 running to the UMW without specifying the amount, and it stated that District 50 would "make every effort to repay this indebtedness to the satisfaction of the United Mine Workers of America. * * *" The Articles authorized District 50 to use the name, "District 50 Affiliated with the United Mine Workers of America."

After the adoption of these Articles, District 50 continued to pay a per capita "tax" to the UMW of 50 cents per member per month until District 50's treasury was reduced to $500,000, at which time it borrowed $500,000 from the UMW. This 1961 loan was made by the UMW upon the intercession of John L. Lewis, who had retired a few years before but took occasion to review with the officials of the UMW then in office the special considerations applicable to District 50, the organization which he had created and fostered as part of a wide-ranging UMW program.

During this period new discussion started between cognizant officers of the UMW and A. D. Lewis, as president of District 50 (though it merits reiteration that his salary was still being paid by the UMW). The purpose of these meetings was to negotiate new Articles of Affiliation and to make more precise the obligations of District 50 to pay back the loans. The two sides reached a general oral agreement during January of 1962.

---

2. Hearings Before the Senate Select Comm. on Improper Activities in the Labor or Management Field, 85th Cong., 1st Sess. (1957). These Hearings were followed by the Hearings on Union Financial and Administrative Practices Before the Subcomm. on Labor of the Senate Comm. on Labor and Public Welfare, 85th Cong., 2d Sess. (1958), chaired by Senator John Kennedy.

3. Section 101(a) (1) of the Act, 29 U.S.C. § 411(a) (1) (1964):

Every member of a labor organization shall have equal rights and privileges within such organization to nominate candidates, to vote in elections or referendums of the labor organizations, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws.

On January 24, 1962, prior to reduction of their agreement to writing, A. D. Lewis died. Elwood Moffett, then Vice President of District 50, succeeded automatically to the presidency. Moffett had not been a party to the negotiations between UMW officers and A. D. Lewis (there were strained relations between A. D. Lewis and Moffett), but he was approached not long after the death of A. D. Lewis with a draft agreement (including a note, a financial agreement, and the Articles of Affiliation) that had been prepared by the UMW's general counsel. The basic agreement provided that the $23,000,000 in loans was to be partially offset by the amount of dues that District 50 had paid the UMW between 1936 and December 31, 1961. The difference, approximately $8,000,000, was to consti-

tute a debt from District 50 to the UMW. District 50 was to continue paying the UMW 50 cents per member per month; 40 cents of this figure was to go to retirement of the debt and 10 cents was to be an affiliation fee.

There was little if any negotiation over the terms of this agreement. The papers, including the $8,000,000 note, were executed on February 26, 1962, and all parties expressed themselves as satisfied with the results. District 50 was not at that time or during any of the negotiations represented by legal counsel.[4] On April 10, 1962, the Executive Board of District 50 unanimously approved the agreement.

In late 1962 District 50 and the UMW approved a "moratorium" on the 40-cent portion of the per capita payments that

---

4. Welly K. Hopkins, Esquire, then General Counsel for the UMW, arranged a meeting on January 19, 1962, with Edward L. Carey, Esquire, a lawyer then in private practice who had represented District 50 on matters unrelated to the Articles of Affiliation. It was contemplated that Carey would represent District 50 in the negotiations over the Articles and draw up a draft, but at the preliminary meeting Carey indicated that he had no knowledge of the background facts at that time, and that he would be better informed the following week after discussion with the officers of District 50. In the meanwhile he had another case to try. On February 1, 1962, Hopkins was informed that Carey no longer represented District 50. (UMW brief at pp. 26-27.) Mr. Carey's services were terminated by Edward Moffett, who took office as president upon the death of Mr. A. D. Lewis on January 24, 1962.

It is undisputed that District 50 was not represented in the matter at hand by Mr. Carey. The UMW brief states (p. 27):

[P]laintiff's present counsel [Edward Carey] never represented District 50, or received any confidence from anyone concerning or related to the present litigation, or which pertained in any way to the articles of affiliation, the financial agreement, the trade name or the promissory note.

Mr. Hopkins noted at trial that District 50 had counsel on its staff, a Yelverton Cowherd and Alfred Treherne, its present general counsel. But they had

been appointed during the period of vassalage. Mr. Hopkins testified that he did not know whether District 50 had any other counsel. We are assuming herein that Mr. Hopkins was correct in his recollection that he never advised District 50 or any of its officers or executives that it was not necessary to have outside counsel. Given the context of the matter before us, with the officers of District 50 executing what was represented to them to be an agreement negotiated during the period of vassalage, if the UMW and Mr. Hopkins wanted to avoid the problems now focused on by the court, they should have insisted that District 50 be represented by independent counsel in the negotiations, or at least have affirmatively advised District 50 of the desirability and importance of retaining independent counsel. Mr. Hopkins to some extent reflected this approach in his preliminary meeting with Mr. Carey, which he insisted be attended by others to avoid any speculation that he might have placed himself in a compromising position. (Def. Exh. 1.) But after the death of A. D. Lewis and succession of Elwood Moffett, he did not follow up on the need for independent counsel. A lawyer's professional responsibility to avoid giving advice to a person not represented by a lawyer, if there is a reasonable possibility of conflict with the interests of his client, is, of course, subject to the exception that he may give the advice to secure counsel. American Bar Association Code of Professional Responsibility (Disciplinary Rules) DR 7–104.

represented debt retirement because of financial difficulties that District 50 was experiencing. In July of 1963 debt payments were resumed but at a lower rate. In August of 1964 they were terminated altogether. However, the 10-cent affiliation fee, which had been paid steadily since the signing of the agreement, continued to be paid until March 6, 1968. On that date the UMW exercised its option to cancel the affiliation agreement on 30 days' notice. The apparent motivation for this move was unrelated to the matters previously discussed, but was rather the displeasure of the UMW over a District 50 resolution favoring industrial use for atomic energy, a position contrary to the policy of the UMW.

## II

While this action is on the surface a simple action on a promissory note, reflection on the background leading up to the signing of that note makes it clear that the issues involved are controlled not so much by historic common law doctrines and concepts, as by the adjustment wrought in pertinent legal relationships by national labor legislation.

It ·was the Landrum-Griffin Act that brought about the legal necessity for changing the relationship between the UMW and District 50, and it was the Landrum-Griffin Act which dictated, in broad terms, the nature of the new relationship. Section 101(a) (1) of that Act, *supra* note 3, assures that "Every member of a labor organization shall have equal rights and privileges within such organization * * * to vote in elections or referendums of the labor organizations, to attend membership meetings, and to participate in the deliberations and voting upon the business of such meetings, subject to reasonable rules and regulations in such organization's constitution and bylaws," 29 U.S.C. § 411(a) (1) (1964). This does not countenance the denial of voting rights to members of "provisional" districts whose officers and affairs are determined and dictated by the international union. After passage of the Act it was no longer permissible for the members of District 50 to continue as nonvoting, second-class members of the United Mine Workers. They had to become either full members of the UMW with equal rights and representation, or members of an independent labor organization not controlled by UMW.[5]

---

5. Professor Archibald Cox, who assisted closely in the preparation of the Landrum-Griffin legislation, has stated:

> Time and litigation will be required to determine what are "reasonable rules and regulations," but the basic distinction is not hard to illustrate. The division of members into voting and nonvoting classes exemplified by the prior practice of the Operating Engineers is contrary to section 101(a).
> * * * The principle underlying section 101(a) (1) is that those who are bound, as members, by the union's decisions should have the opportunity to take part in the deliberations.

Cox, Internal Affairs of Labor Unions Under the Labor Reform Act of 1959, 58 Mich.L.Rev. 819, 833–834 (1960).

We are not unaware of Ragland v. United Mine Workers of America, 188 F.Supp. 131 (N.D.Ala.1960), which involved an attempt by members of District 50 locals to obtain a temporary injunction against the holding of the UMW International Constitutional Convention scheduled for October 1960 on the grounds that under the Landrum-Griffin Act the plaintiffs had the right to participate and vote but had not been invited to attend the convention. The District Court denied their request on three alternative grounds, one of which it stated in the following manner:

> This Court is of the further opinion that the "equal rights" provision of the Act was not intended by Congress to change the internal organizational structure of unions but granted rights and privileges to certain locals and members that were not conferred by the constitution and charter under which the unions and locals operate. It is the opinion of the Court that this Act was intended for use in those instances where "members" as opposed to "provisional members" are threatened with a deprivation of their rights that were previously afforded or granted to them under the unions' constitution and under their charter. In other words, the Act is designed to protect the right to vote and

The United Mine Workers chose to give District 50 independence rather than "equal rights and privileges." The Landrum-Griffin Act poses no absolute barrier to such an approach, but it makes demands of the process by which the fission is achieved. It is not enough that out of the bargaining process emerge two labor organizations, each of which extends equal rights and privileges to all of its members. That simple condition could be satisfied if one group ended up with all of a union's financial assets and the other with all its liabilities.

Where the members of a union will all continue to be members the act requires equality. The special question presented by this case is the proper relationship between the main union and the portion preparing for a separation intended by the parent union to avoid the statutory requirement of on-going equality. What is required for this is at least some reasonable balance (not necessarily complete equality) of bargaining position during preparation for reorganization, sufficient to give enduring vitality to the agreement as one reached by an independent union.[6]

This requirement is, if anything, stated more softly than the law might have required if applied strictly to the case at hand. For on a strict reading of the act, the UMW, having let a year go by since passage of the act, was required then and there to provide full equality to District 50 members in regard to referendums and to participation in membership meetings. 73 Stat. 535 (1959).[7]

There is a legal analogy in the separation agreements required in the antitrust field when one company must divest itself of another company to obviate an unlawful merger. Such a divestment must restore competition by establishing the disaffiliated company as a viable competitor, ready to survive in the marketplace. Utah Public Service Comm'n v. El Paso Natural Gas Co., 395 U.S. 464, 470, 89 S.Ct. 1860, 23 L.Ed.2d 474 (1969). In the present case, of course, there is not the same requirement to reestablish competition between the unions. (It may be noted that some element of conflict, not unrelated to the interest of competition, was inherent in the organization by District 50 of atomic energy workers in view of the ultimate

participate where that right exists and not for the purpose of conferring the right to vote and participate in cases where it has not previously existed or should have existed.

It may be, as that court indicated, that a kind of nonvoting "provisional" membership could be set up consistently with the provisions of the Landrum-Griffin Act—for example, such an arrangement would seem reasonable if it is desired to let retired persons retain their "membership." It is possible that "provisional" nonvoting membership in an international union might be acceptable if the provisional members who were associated with the international union in a loose-knit way were essentially independent, electing their own officers and controlling their own affairs. We cannot entirely agree with the Northern District of Alabama, however. We reiterate that the act does not contemplate denial of voting rights to members of "provisional" districts whose officers and affairs are determined and directed by the international union. To avoid any misunderstanding, we expressly note that we are not to be taken

as passing on the situation of independent locals or labor organizations, in which the rule of equality is respected, who voluntarily enter into or continue a status as an affiliate of a national or international labor organization.

6. The concept of reasonable balance between the parent union and the portion to be separated in entering into an agreement to establish the independence of the latter is derived from the overall implications of the Landrum-Griffin Act. It is not to be confused with the equality mandated for each of the members remaining in the on-going organization. The statutory equality for all members may mean more votes, and greater strength, for one division—here District 50—than another.

7. We need not consider whether or to what extent any requirement on the part of the UMW would have been rendered inapplicable in the event of expulsion proceedings, since it is not asserted that either the procedure or the grounds were appropriate for expulsion of District 50.

competition between atomic energy and fossil fuels.) But the absence of an interest in direct competition between unions does not obliterate an underlying similarity between the two situations which make the principle of *El Paso* apposite.

In *El Paso* the acquiring company, through its acquisition, prevented the possibility of further natural, competitive growth on the part of the acquired company. Simple dissolution, without taking this weakness into account, would have launched the acquired company into the market place of the present equipped only with the survival tools of the past. Simply stated, control by the acquiring company prevented the normal development of the acquired company and crippled its ability to reenter the business world as a vigorous business entity.

■■ In the case of District 50, the autocratic control of the UMW over District 50 had profound effect on the development of District 50. The dramatic expansion of District 50's membership was due in large part, if not primarily, to the proclaimed purposes of the UMW beginning with its purpose to protect itself against raiding with a buffer union. While expansion is in general likely to be welcomed by labor unions, that does not apply to forced-draft expansion at an inordinately expensive cost—expensive enough to lead to transfers to District 50 of $23,000,000. The dominating union prevented the normal, independent financial development of the "acquired" union during their previous association. When the time came for independence, the imposition of even an $8,000,000 debt shackled District 50.

While businessmen may sometimes regard early losses in a new venture as capital investment in "good will," a debt of the magnitude of $8,000,000 overhanging a union about to be put on its own for the first time is hardly consistent with independent viability. At the very least this overhanging debt was a mortgage of dues for years to come—for even assuming the 40c per capita per month payment

schedule and a roll of 200,000 members could have been maintained, more than eight years would have been required to pay the $8,000,000. In reality, payments had to be excused almost from the start.

Looking into another aspect of the dealings between the parties, we take note that the total domination of District 50 by the UMW prevented the normal development of District 50 not only financially but also in terms of preparations for independence. Officers of District 50 were imbued with the attitude expressed by Elwood Moffett in 1959: "[W]e take our advice and instructions from the officers of the [UMW] International Executive Board. We always have and we always will." Two years later, officers with such training were expected to represent the interests of District 50 against the UMW and its International Executive Board. They were appointees of the UMW's Board. The officers signing the agreement for District 50 were unrepresented by legal counsel while the UMW was fully represented by counsel at all times. They very probably had a significant legal position under the Landrum-Griffin Act to claim a right to participate in free UMW elections with the huge membership of District 50 if there was no disaffiliation of District 50 as an independent union in full compliance with the requirements of the act. Yet District 50's officers never raised this significant point, nor any other issue, and the "bargaining" consisted of simple acceptance of the terms drawn up by the Mine Workers' counsel.

Finally, it should be noted that the size of the debt contributes to a continuance of significant elements of the state of "vassalage" found by the district court to have existed before 1962. The present case illustrates the point well. District 50, having stopped payments on the note in 1964, became liable (assuming the note's validity) for the whole remaining amount on demand under the note's default clause. Yet it was not any financial default which triggered the demand for payment, and ultimately this lawsuit. The stimulus was District 50's public

pronouncement in support of the domestic use of atomic energy, which was made on February 13, 1968.

Common-law precepts alone might well be invoked to support the conclusion that the UMW and its officers had a fiduciary obligation to protect the interests of District 50 as well as the interests of the UMW by assuring that District 50 was provided with the material information, available from the UMW, and that it had effective independent legal representation in order to insure that any agreement reached might endure as a free and untrammeled exercise of the rights of District 50 and its members. Such a fiduciary obligation had its roots in the recent vassalage of District 50, the fealty to the UMW and its officers which accounted for the positions in District 50 held by those signing the agreement, and the legal as well as practical problems involved in their readjustment of loyalty and responsibility to the members of District 50 as a distinct, separate and independent entity, all of these factors being significantly compounded by negotiations in which the officers of District 50 reached agreement with their recent masters without independent legal representation, although the matter was fairly beset by important legal considerations. It is in this context that a court must view the fact that the officers of District 50 moved swiftly to sign the agreement and seemed to be guided primarily by feelings of gratitude and relief that the UMW had not pressed for the amount of $23,000,000 but had been willing to accept District 50's note of $8,000,000.

We are not to judge the situation by lesser standards that in former times might have been applicable when, purely as a matter of grace, a vassal was released from feudal obligations or a serf emancipated.

However, we place our ruling not on common-law concepts as such but on the conclusion that the fiduciary obligation of the UMW was significantly extended for the circumstances before us by the policy of the Landrum-Griffin Act. One

significant expression of that policy is the requirement, embodied in § 105 of the act, 29 U.S.C. § 415 (1964), that labor organizations inform their members of the provisions of the statute. Congress was not content with creating rights *in vacuo* but insisted that union members be made aware of their rights so that they could exercise them intelligently.

Independent and knowledgeable representatives of each party would have taken into account that the uses of the UMW loans had particular benefit to the UMW, and to the objectives of that organization, particularly as envisaged in the grand design of John L. Lewis for a buffer union sent into battle first against the powerful AFL and later also against the CIO. It may be that the loans also benefited District 50 to some extent, but it would be hard to say to what extent they could be regarded as a realistic disbursement from the point of view of District 50 independently considered. With legal representation the officers of District 50 would have been informed of rights and positions available under Landrum-Griffin. One need not assume that they would have been rightfully entitled to use District 50's strength to "take over" the UMW. But a reasonable balance of bargaining position between the parties would have included an awareness of their strengths as well as their weaknesses and would have helped insure that any disaffiliation agreement would be fair and ensure the viability of District 50 as an independent union.

It would ignore reality, even under the most indulgent reading of the facts, to conclude that the members of District 50 were afforded reasonable protection and balance of bargaining position with other members of the UMW. Such balance and protection was indispensable to assure the validity of negotiations and on-going agreements aimed at avoiding the primary goal of the Landrum-Griffin equality requirements.

By these standards the note and agreement are not enforceable as such, and the claim of the UMW must rest on some

other branch of the law, such as unjust enrichment, a point we consider in part III.

## III

■ Having determined that the note and agreement are not enforceable as such, because of the circumstances preceding and surrounding their execution, we are left with the question whether there are any obligations underlying the note which might still support a recovery for the plaintiff UMW.

Since it is impossible to return the parties to the conditions prevailing in 1961 to negotiate their relations anew, this time as equal and independent bargainers, the court, using its equity powers, must seek the best solution possible, recognizing the necessity of working with conditions as they are and not as we might wish to reconstruct them. This is the approach of equity courts in other difficult areas. For example, when wills contain imperfect charitable bequests, the court, under the *cy pres* doctrine, will comply with the testator's intent as nearly as possible when his exact instructions can no longer be honored.[8] Similarly, courts will not always order dissolution in antitrust cases involving illegal mergers. The court may consider that although the evidence is clear enough to warrant an injunction against future mergers, the circumstances are not sufficiently clear cut to warrant the drastic remedy of divestiture undoing past acquisitions.[9]

The particular difficulty that we face in this case is the disentanglement of financial transactions stretching across many years and supported by motives and expectations that were never entirely clear. The UMW would have us believe that the money denominated as "loans" by the parties was used chiefly for the benefit of District 50, and that retention by District 50 of the benefits derived and the money would constitute unjust enrichment. As our exposition of the relations between the parties demonstrates, that viewpoint is too simplistic and mechanical to be just. Most of the amount "loaned" to District 50 was used to finance expansion and recruitment or to pay District 50's per capita tax assessments to the UMW. District 50 might well have been able to pay all of its debts, including the per capita taxes, without the need for loans from the UMW if it had not engaged in the intensive expansion program that served the policies of the UMW, part buffer and part expansionist, devised by John L. Lewis. Mr. Lewis said as much to the UMW Board in 1946, stating that District 50 could be "self-supporting" but without the rapid expansion "we would like," and that expansion should continue "as long as we are able to do so." No doubt some benefit—chiefly in the form of increased membership—flowed to District 50 from these expenditures. But it is impossible to say that such a forced rate of expansion would either have been adopted by an independent District 50 or can now be justified, retrospectively, on quantum meruit principles as prudent expenditures that yielded corresponding benefits to District 50. The motivation for the expansion and the expenditures it required came chiefly from the UMW, and expansion served UMW purposes as much as, and probably more than, it served the purposes of District 50. At this point in time we simply cannot apportion the benefits from the loans between District 50 and the UMW.

The UMW, serving its own purposes, has made resolution of which union benefited to what extent impossible to ascertain. It dominated and ran District 50 in such a manner and to such an extent as to tangle the affairs of the two unions beyond any practicable effort by a court at this time to sort, straighten out, and

8. *E. g.*, Briggs v. Merchants Natl. Bank, 323 Mass. 261, 81 N.E.2d 827 (1948).

9. *E. g.*, United States v. Jerrold Electronics Corp., 187 F.Supp. 545, 566–567 (E.D.Pa. 1960), affirmed per curiam, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806, rehearing denied, 365 U.S. 890, 81 S.Ct. 1026, 6 L. Ed.2d 200 (1961).

reconstitute. That being the case, we may find appropriate guidance in Bigelow v. RKO Pictures, Inc., 327 U.S. 251, 66 S.Ct. 574, 90 L.Ed. 652 (1964). In that case there was an antitrust violation which had both caused financial loss to the plaintiff and obscured the exact amount of the loss incurred. The Court warned that a verdict could not be based purely on speculation or guesswork, but nonetheless stated, "The most elementary conceptions of justice and public policy. require that the wrongdoer shall bear the risk of the uncertainty which its own wrong has created." 327 U.S. at 265, 66 S.Ct. at 580. The *Bigelow* case is not a perfect parallel since control of the UMW over District 50 was apparently not wrongful before the Landrum-Griffin Act became effective. But it is the case, as has been noted, that the UMW failed to take the full corrective measures following Landrum-Griffin which would have made a firm basis for a fair resolution that did not require court involvement.

Even when a person seeking restitution has not been guilty of tortious conduct he cannot recover for services rendered or property transferred to a nontortious recipient on the basis of cost or loss incurred, but only on the basis of value to the recipient. Restatement of Restitution § 155. In this case the transfer did not yield benefit to District 50 equal to the dollars transferred because of the UMW expansionist expenditures that motivated and were implicit in the transfer. Since it was the UMW's activities that made it infeasible for a court to ascertain the value of benefit conferred or mold an appropriate order for relief, the UMW is disabled from seeking an equitable remedy.[10]

Finally, we have taken note of District 50's request for an accounting for the UMW. The District Court dismissed this claim for lack of evidence, and we find no reason to upset its conclusions in that respect.

The judgment of the District Court in favor of the United Mine Workers on the note is reversed and the cause remanded with directions to enter a judgment for the defendant. The judgment in favor of the UMW enjoining further use of its name is vacated as moot. The judgment dismissing the counterclaim of District 50 is affirmed. The parties will share equally the costs of the appeal.

So ordered.

---

10. It is settled doctrine that when parties are equally innocent equity permits the loss to be borne by the actor whose conduct has occasioned the loss. Am.Jur. Equity § 146 and cases cited.