PER CURIAM.
 

 I
 

 Issues
 

 This is a suit brought in the former United States Court of Claims and seeking refund of corporate income taxes paid. It involves several years during which the taxpayers incurred expenditures to effect divestiture of corporate property pursuant to requirements of the United States Supreme Court. Some expenditures were fruitless as the divestiture plans they were to implement were ultimately disapproved. Some helped effectuate the final approved divestiture. The issues we are to decide are the proper treatment of these expenditures. We hold in Part III of this opinion that, in general, with certain exceptions, the expenditures are deductible as ordinary and necessary business expenses under section 162 of the Internal Revenue Code. The exceptions are set forth in the second portion of Part III, and as there explained, expenditures by a subsidiary are deductible to some extent under the same code section, and to what extent remains to be determined in a later phase of this case.
 

 This case was tried before then Trial Judge George Willi, who, on June 25, 1981, submitted a recommended decision and conclusion of law in accordance with former Rule 134(h). Both parties filed briefs and exceptions to his findings of fact and opinion; taxpayers filed first and are therefore designated appellants even though their objections were relatively minor; we characterize the government as appellee because it filed second. The successor Court of Appeals for the Federal Circuit returned the case to Judge Willi, now of the Claims Court, by Order of October 4, 1982, so that he might enter judgment in accordance with his report. He did this on October 9, 1982, and we heard oral argument November 1, 1982. Our opinion for the most part incorporates Judge Willi’s recommended opinion, generally for the plaintiffs, with modifications. His decision did not purport to determine the quantum of recovery on the issues on which he held for plaintiffs, this being left under former Rule 131(c) for future determination, nor does, of course, the judgment of October 9, 1982, do this.
 

 II
 

 Facts
 

 In 1964 the Supreme Court held in a civil suit that when the El Paso Natural Gas Company (EPNG) acquired the Pacific Northwest Pipeline Company (Pacific) in 1957, it substantially lessened competition in the sale of natural gas in California in violation of § 7 of the Clayton Act.
 
 [1]
 
 The Court thereupon remanded the cause to the district court with directions that the latter “order divestiture without delay.”
 
 United States v. El Paso Natural Gas Co.,
 
 376 U.S. 651, 662, 84 S.Ct. 1044, 1050, 12 L.Ed.2d 12 (1964). Pursuant to that mandate, the district court, after extensive hearing in each instance, entered two consecutive divestiture decrees that the Supreme Court, in turn, found unresponsive to its mandate.
 
 Cascade Natural Gas Corp. v. El Paso Natural Gas Co.,
 
 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967);
 
 Utah Public Service Commission v. El Paso Natural Gas,
 
 395 U.S. 464, 89 S.Ct. 1860, 23 L.Ed.2d 474 (1969). Parenthetically, it was not until 1973 that the Court affirmed the third and final divestiture decree entered by the district court.
 
 El Paso Natural Gas Co. v.
 
 
 *706
 

 United States,
 
 410 U.S. 962, 93 S.Ct. 1440, 35 L.Ed.2d 697.
 

 The predominant question in this tax refund suit, involving the years 1964 through 1969, is the tax treatment, deductible or capital, to be accorded the expenditures made by EPNG
 
 [2]
 
 in those years for the legal, consulting, accounting, and related services that it appropriated to the formulation and partial implementation of the two divestiture decrees that were ultimately set aside by the Supreme Court.
 

 EPNG’s principal business throughout has been the production, transmission and sale of natural gas.
 
 [3]
 
 In 1957 it had large reserves in the San Juan Basin, located in the so-called “four corners” area (the intersection of Utah, Colorado, Arizona, and New Mexico), from which it serviced more than one-half of the burgeoning California market as that state’s sole out-of-state supplier.
 

 Pacific also had substantial gas reserves in the San Juan Basin. In 1954 it obtained Federal Power Commission (FPC) approval to construct and operate a pipeline to the State of Washington to supply gas from the basin to the then unserved Pacific Northwest area. It was thereafter authorized to receive large quantities of Canadian gas that it planned to sell both in that area and in the rapidly expanding California market. To the latter end, in 1956, Pacific began extensive negotiations for the sale of Canadian gas to Southern California Edison Company, Southern California’s largest industrial user of natural gas and one whose requirements were then supplied by EPNG only on a service interruptible basis. Faced with the possible loss of such a large customer, EPNG successfully opposed the necessary regulatory approvals and retained the account by granting Edison a guaranteed continuity of supply as well as substantial price concessions.
 

 EPNG had entertained designs on acquiring Pacific as early as 1954, but its formal offer to do so in 1955 was rebuffed. It renewed its acquisition overtures in 1956 while Pacific was negotiating to obtain Edison’s business, as previously mentioned. This time the effort was successful, with Pacific’s directors approving an exchange of its shares for EPNG shares in November 1956. By May 1957 EPNG had acquired 99.8 percent of Pacific’s stock.
 
 [4]
 
 In the face of that development, the United States Department of Justice, in July 1957, filed a civil complaint in the district court of Utah charging that the acquisition violated the Clayton Act, n. 1,
 
 supra.
 
 In November 1962,
 
 [5]
 
 after a trial, the court dismissed the complaint. On a direct appeal, the Supreme Court reversed, ordering “ * * * divestiture without delay * * 376 U.S. at 662, 84 S.Ct. at 1050.
 

 The purpose of the Court’s divestiture order was restoration of competitive balance in the interstate supply of natural gas to California, this to be accomplished by placing Pacific in the same position relative to EPNG that it occupied when it was acquired in 1957.
 

 Following issuance of the Supreme Court’s mandate, EPNG initiated efforts to formulate a proposal for compliance. The effort entailed extensive studies of such matters as (1) gas reserves and other physical properties for purposes of allocation, (2)
 
 *707
 
 present and prospective customer demand in the area to be served by the divested assets, (3) financing requirements including distribution of debt, (4) state and federal regulatory requirements, and (5) tax consequences to EPNG and its 117,000 shareholders. EPNG incurred substantial expense in conducting these activities.
 

 In October 1964 EPNG submitted its proposal for divestiture to the district court and extensive hearings were then held on it. These hearings continued well into 1965 and were accompanied by intensive negotiations between EPNG and the Department of Justice, negotiations that culminated in an agreed decree that was presented to the court and adopted by it on June 24, 1965.
 

 To effectuate the decree, EPNG formed the Northwest Pipeline Company (Northwest) as a wholly owned subsidiary
 
 [6]
 
 to receive the divested properties subject to the debt obligations that had been incurred by EPNG to finance the considerable upgrading and expansion of the Pacific properties that it had carried out during the 8 years that had elapsed since acquiring Pacific. Because of Northwest’s thin capitalization, n. 6,
 
 supra,
 
 it lacked the funds to obtain the management personnel and staff necessary to conduct the business operations planned for it. Accordingly, in 1965 and 1966, EPNG advanced Northwest $75,-014.29 and $232,632.13, respectively, both for these purposes and to finance legal and related activities necessarily undertaken by Northwest to perfect its role in implementation of the decree. None of these advances have ever been repaid.
 

 In the proceedings that led to entry of the first decree, several interested parties were denied intervention by the district court. They appealed the adverse ruling and the Supreme Court noted probable jurisdiction. 382 U.S. 970, 86 S.Ct. 528, 15 L.Ed.2d 463 (1966). The Court reversed, ordering the district court to permit each of the parties to intervene as a matter of right. More importantly, and despite the Justice Department’s avowed agreement with the terms of the first decree, the Court vacated that decree as failing to meet the requirements of its divestiture mandate with respect to (1) allocation of gas reserves, (2) financial benefits and burdens assigned Northwest, and (3) the potential for continuing control of Northwest by EPNG. It therefore remanded the cause, ordering a
 
 de novo
 
 hearing addressed to the formulation of an appropriate plan of divestiture, the hearing to be before a different district judge.
 
 Cascade Natural Gas Corp. v. El Paso Natural Gas Co.,
 
 386 U.S. at 129, 87 S.Ct. at 932, 17 L.Ed.2d 814.
 

 In light of the Supreme Court’s holding and remand directive, EPNG shortly thereafter set about deactivating Northwest. This was accomplished during 1967 with the subsidiary becoming a mere corporate shell that remained in existence as such thereafter
 
 [7]
 
 until 1974 when it was reactivated as hereafter explained. In 1967, EPNG advanced Northwest $420,596.39 for operating purposes and to finance the winding down of its business activities. None of that sum has ever been repaid.
 

 Concurrent with the deactivation of Northwest, and as an essential preliminary to the formulation of a divestiture decree that would pass Supreme Court muster, EPNG initiated a new round of the same types of analyses and studies that it had conducted preparatory to the first decree. It incurred comparable expenses to accomplish that work. In August 1967, it submitted its new proposal for divestiture to the court. Extended hearings, running into March 1968, followed.
 

 In August 1968 the court entered its decree accepting ENPG’s proposal as to the assets to be divested, but rejecting it as to the method of divestiture. In the latter
 
 *708
 
 respect, the court designated the Colorado Interstate Gas Company as the entity to receive the divested properties, affording EPNG and Colorado 35 days to agree on the terms by which the transfer of properties was to be effected. Such an agreement was reached and, in November 1968, the court amended its decree to incorporate the substance of that agreement. Northwest was to be “taken off the shelf” and used as the vehicle to accomplish the transfer.
 

 Of the 38 participants in the district court proceeding that culminated in the second decree, only one, the Utah Public Service Commission, appealed the court’s final decree.
 

 Following entry of the decree, EPNG incurred expenses in 1968 and 1969 directed to its implementation.
 

 In April 1969, the Supreme Court, rejecting Utah’s attempt to dismiss its appeal, held the second decree defective both in the quantity and location of gas reserves to be divested and in the method of divestiture, which left EPNG with a preferred stock interest in Northwest, the chosen vehicle for divestiture.
 
 Utah Public Service Commission v. El Paso Natural Gas Co.,
 
 395 U.S. at 464, 89 S.Ct. at 1860, 23 L.Ed.2d 474. Once again, therefore, the cause was remanded for development of a decree compatible with the divestiture mandate of 7 years before.
 

 During the remainder of 1969, the final year involved in this proceeding, EPNG expended monies to conduct still a third round of resource, market, financial, legal and tax analyses and studies directed to the formulation of a decree that would be acceptable to the Supreme Court. The third decree was not entered until 1972. As earlier noted, it was approved by the Supreme Court in 1973.
 
 [8]
 
 The divestiture effected by that decree resulted in a substantial contraction of EPNG’s business. The extent of the contraction far exceeded surrender of the business and properties acquired from Pacific. It included the loss of physical additions and improvements representing outlays of more than $200 million and significant quantities of gas reserves. The reserves acquired from Pacific represented only 18.2 percent of the two companies’ combined reserves, whereas those ultimately divested amounted to 35 percent of the total.
 

 Ill
 

 OPINION
 

 A.
 
 Expenses Generally Deductible
 

 With Northwest as the vehicle for divestiture, the transaction as it was carried out constituted a reorganization within the meaning of § 368(a)(1)(D) of the Internal Revenue Code
 
 [9]
 
 followed by a distribution of Northwest stock to EPNG shareholders that qualified under § 355.
 
 [10]
 

 
 *709
 
 Although the divestiture transaction here involved constituted a statutory reorganization, in which case expenses of conception and implementation are generally to be capitalized on the theory that the altered capital structure will provide a future business benefit of indeterminate duration, and despite the fact that, no cancellation or redemption of EPNG stock having occurred, the transaction did not fit the Internal Revenue Code’s definition of a partial liquidation,
 
 [11]
 
 for which appurtenant expenses are normally accorded current deductibility, appellants nonetheless contend for deductibility. They do so on the ground that in this instance the change in corporate structure resulting from the reorganization created nothing of future benefit to either EPNG or its shareholders and was distinctly subordinate to accomplishment of the transaction’s dominant aspect, the divorce of a substantial segment of EPNG’s business and property holdings. Accordingly, it is urged, the substance of the transaction was in the nature of a partial liquidation,
 
 i.e.,
 
 a contraction of the corporate enterprise.
 

 We agree with EPNG that the Supreme Court’s 1969 decision, at least, and the divestiture that followed therefrom, embodied no real benefit to EPNG or its shareholders and were in fact a substantial detriment. Anything in the first two divestiture plans that was beneficial had to be stripped away to satisfy the Court. The object of providing competition to the California market in natural gas was pursued far beyond the point of merely restoring the status quo as it had existed before the illegal 1957 acquisition. The first two divestiture plans conferred no benefit for the different reason that they could not be implemented and had to be abandoned.
 

 Appellee appears not to argue that EPNG obtained any benefit in a real sense, but urges that any new corporate structure, whether differing from the old by way of addition or subtraction, is for tax law purposes a new “asset” by what is apparently a kind of legal fiction or conclusive presumption. The basis for this belief we discuss later in this opinion.
 

 As the credentials for current deduction treatment in such circumstances, appellants rely on
 
 Gravois Planing Mill Co. v. Commissioner,
 
 299 F.2d 199 (8th Cir.1962), the source of the so-called “dominant aspect” test,
 
 United States
 
 v.
 
 General Bancshares Corp.,
 
 388 F.2d 184 (8th Cir.1968), and
 
 Transamerica Corp. v. United States,
 
 254 F.Supp. 504 (N.D.Cal.1966),
 
 aff’d,
 
 392 F.2d 522 (9th Cir.1968), in both of which latter
 
 *710
 
 cases the test was the basis for approving deductibility under I.R.C. § 162. Clearly, in point of fact, the dominant aspect of the divestiture imposed on EPNG by the Supreme Court was a significant contraction of its corporate enterprise.
 

 The latter two cases involved divestitures by bank holding companies to comply with new statute law prohibiting their holding banking and non-banking enterprises simultaneously. In one case the non-banking assets were “spun off,” in the other, the banking assets. The absence of any benefit to the enterprise as previously conducted is noted as part of the reason for characterizing the expenses of reorganization as “ordinary and necessary.”
 

 Appellee relies on
 
 E.I. Du Pont de Nemours & Co.
 
 v.
 
 United States,
 
 432 F.2d 1052 (3d Cir.1970), for its view that any and every reorganization expense is an imputed or presumed benefit even if incurred in a divestiture of assets. DuPont was required by an antitrust decree to terminate an interest held by it and Imperial Chemical Industries Ltd., jointly in Canadian Industries Ltd., a Canadian Corporation (CIL). The plan provided for an enhanced public share in CIL and a division of its assets between two new companies, DuPont’s portion going to a new company to be its wholly owned subsidiary. The district court held there was no improvement or betterment in DuPont’s property, but the court of appeals stated at 1059 “[r]ather, the expenditures resulted in a benefit to the taxpayer which could be expected to produce returns for many years in the future.” This appears as if the court had in mind a real benefit, not one that was fictitious or imputed, or at least it thought one had not been disproved as the taxpayer’s burden of proof would have required it to do. It is obvious DuPont gained sole control of certain assets which it previously had controlled jointly with Imperial Chemical Industries Ltd. Therefore, the transaction was not all divestiture, and the general rule applied rather than the exception appellants seek to apply here.
 

 The expenditure on futile plans that had to be abandoned is a feature not found in the precedents cited, but as to these expenditures, the point seems even more irrefutable, that no asset was added to other corporate assets, not added really or even fictionally.
 

 Appellee does not dispute appellants’ characterization of the precedents they rely on or their adaptability to the facts at hand. Instead, it claims that they have been neutered by the Supreme Court’s subsequent pronouncements concerning the tax treatment of expenses associated with property dispositions generally and, more particularly, by its rejection of the dominant aspect test in its decisions in the companion cases of
 
 Woodward
 
 v.
 
 Commissioner,
 
 397 U.S. 572, 90 S.Ct. 1302, 25 L.Ed.2d 577 (1970), and
 
 United States
 
 v.
 
 Hilton Hotels,
 
 397 U.S. 580, 90 S.Ct. 1307, 25 L.Ed.2d 585 (1970). For reasons that will appear, appellee’s contentions are without merit.
 

 Woodward
 
 involved the tax treatment of expenses incurred by a corporate stockholder in a judicial appraisement of the stock of dissident minority owners which he had to buy in order to obtain a perpetual extension of the corporate charter. By law of the state of incorporation, the stock of such dissidents could be bought at a value to be determined by the state courts if voluntary agreement could not be obtained.
 
 Hilton
 
 was a very similar case except that a proposed merger could be effectuated only if dissident’s stock was bought at an appraised value; here the taxpayer was the corporation. The usual rule applied because there was no question of a divestiture, and obviously if the transactions had not been seen by management as beneficial, they would have been dropped. They were not measures forced by the judicial power.
 

 Appellee’s reliance on
 
 Woodward
 
 and
 
 Hilton
 
 before us was not so great as it was before the trial judge and his elaborate analysis in refutation need not be repeated. Suffice it that Justice Marshall wrote at 397 U.S. at 575, 90 S.Ct. at 1304:
 

 It has long been recognized,
 
 as
 
 a
 
 general matter,
 
 that costs incurred in the acquisition or disposition of a capital asset are to
 
 *711
 
 be treated as capital expenditures. [Emphasis supplied.]
 

 Divestiture forced by judicial power is a special matter since it has been held, and we agree, the rule is different. The Court says that the “primary purpose” test is uncertain and difficult to apply, while the “origin of the claim litigated” test is easy and helpful when the “origin of the claim litigated is in the process of acquisition itself.”
 
 Id.
 
 at 577, 90 S.Ct. at 1306. This discussion is simply not applicable to the case we must decide. If we are to look at the “origin” in the case before us, it seems obvious enough that the origin is the Supreme Court’s ruling itself. The disposal of property is secondary and occurs far down the line from the origins of the case. We therefore do not think the “origin of the claim” test supports appellee’s position. When appellee says, as it does in its brief, that an “origin of the claim” test is substituted for a “dominant purpose” test, this is in the instant case an exercise in semantics throwing no light on the matter at hand. Usually, as here, one seeking for valid precedents will pay more attention to what courts actually do with the case before them, than to dicta pronouncing rules textually extending beyond the facts of that case to other cases undreamt of by the declaring tribunal. But Justice Marshall does not seem to intend to pronounce a rule for a case such as ours. One precedent involving a forced divestiture is worth a thousand involving something else, when we have a forced divestiture to adjudicate.
 

 A more expansive meaning of dispositions — a meaning that would, for example, include liquidating distributions — would have represented a radical departure from established doctrine, something that the Court gave no indication of undertaking. As applied to the resulting tax treatment of related expenses, the distinction between an asset disposition by liquidation, as opposed to sale, is as stated in Rev.Rul. 77-204, 1977-1 Cum.Bull. 40, 41.
 
 [12]
 

 [Liquidation expenses generally are deductible
 
 under section 162 as ordinary and necessary business expenses. However,
 
 expenses
 
 '
 
 incurred in connection with the sale of assets are not deductible
 
 under section 162. The expenses of sale must be offset against the proceeds of the sale in determining gain or loss on the transaction. [Emphasis supplied.]
 

 * * * * * *
 

 In an effort to isolate EPNG’s divestiture activities from those by which it resisted the claim that it had transgressed the Clayton Act, appellee characterizes the remedy phase of the proceeding as a discrete undertaking concerned only with a transfer of corporate property rather than an integral part of a single effort first to refute the charge of Clayton Act violation and then to achieve the least painful compliance with that Act satisfactory to the Supreme Court. Terming remedy a “crucial” phase of every antitrust proceeding, the Court has rejected such an unrealistic eompartmentalization saying: “ * * * the suit has been a futile exercise if the Government proves a violation but fails to secure a remedy adequate to redress it.”
 
 United States v. E.I. du Pont de Nemours & Co.,
 
 366 U.S. 316, 323, 81 S.Ct. 1243, 1248, 6 L.Ed.2d 318 (1961).
 

 Accordingly, under either the “dominant aspect” test of
 
 Gravois Planing, General Bancshares
 
 and
 
 Transamerica
 
 or the “origin of the claim” test of
 
 Woodward
 
 and
 
 Gilmore
 
 eligibility under § 162 of the expenses at issue is the same.
 

 B.
 
 Certain Expenses not Deductible
 

 Although appellants have lumped all of EPNG’s outlays incident to divestiture in the same basket for deduction purposes, certain categories of them are nondeductible as a matter of settled law.
 

 First, there are the expenses incurred by EPNG to organize Northwest, the subsidiary created to receive the divested properties. Appellants do not except to the trial judge’s adverse conclusion on this item.
 

 
 *712
 
 Second, there is the matter of monies expended by EPNG to obtain FPC approval of Northwest’s operation of the divested properties. These expenses are closely related to the prior item and also must be capitalized.
 
 Radio Station WBIR, Inc. v. Commissioner,
 
 31 T.C. 803 (1959), and
 
 KTWX Broadcasting, Inc. v. Commissioner,
 
 31 T.C. 952 (1959).
 

 Third are the also closely related costs of obtaining rulings from the Internal Revenue Service that the transaction divesting property to Northwest constituted a nontaxable reorganization in respect to which neither EPNG nor its shareholders realized taxable gain. Expenses so exclusively related to a reorganization must be capitalized. 4A Mertens, Law
 
 of Federal Income Taxation
 
 (Rev.1979), Sec. 25.35.
 
 See also Gerli & Co. v. Commissioner,
 
 73 T.C. 1019, 1031-32 (1980).
 

 Appellants urge that to the extent that any of the expenses for which they claim deductibility are required to be capitalized, such items became deductible as abandonment losses
 
 [13]
 
 in 1967 when the Supreme Court, in
 
 Cascade, supra,
 
 rejected the first divestiture plan, and, in 1969, when the second one was rejected in
 
 Utah, supra.
 

 The difficulty with appellants’ contention is that all of the categories of expense for which current deduction is denied herein pertain exclusively to the organization, operating authority of Northwest, and to the reorganization in which it was centrally involved. While it is generally true that expenses incurred in the development of plans involving the organization or reorganization of corporations become deductible when the plans are abandoned,
 
 [14]
 
 the disqualifying feature here is that Northwest, conceived as an entity to serve as the vehicle for divestiture, was never in fact abandoned. To the contrary, it was eventually used for precisely the purpose for which it was created. Temporary dormancy does not amount to abandonment.
 
 A.J. Industries, Inc. v. United States,
 
 388 F.2d 701, 704 (Ct.Cl.1967).
 

 There remains for disposition the treatment of the $728,242.81 that EPNG advanced to Northwest, as earlier noted.
 

 Appellants contend that in 1967 when the Supreme Court rejected the first divestiture decree in
 
 Cascade, supra,
 
 they became entitled to a current deduction for the above amount, either as a bad debt under § 165(a), n. 13,
 
 supra,
 
 or, should the advances be deemed capital contributions, as worthless securities.
 
 [15]
 

 Because Northwest was a member of an affiliated group, nn. 3 & 7,
 
 supra,
 
 for which EPNG filed a 1967 consolidated return, the deduction, if available at all, hinges on the question of whether Northwest’s securities became wholly worthless in EPNG’s hands
 
 *713
 
 in that year. This follows from the explicit provision of the Regulations
 
 [16]
 
 on which EPNG’s privilege of filing a consolidated return was specifically conditioned by the Revenue Code.
 
 [17]
 

 The question of when a security becomes worthless is a factual one, depending upon the circumstances of the particular case. 5 Mertens, Law
 
 of Federal Income Taxation
 
 (Rev.1981), Sec. 28.65, at 316.
 

 For the proposition that Northwest’s stock became worthless in 1967 despite the fact that EPNG maintained the corporation in existence, appellants rely on
 
 Textron, Inc. v. United States,
 
 561 F.2d 1023 (1st Cir.1977). There, by a divided court, the stock of a wholly owned cruise ship subsidiary that had consistently sustained overwhelming operating losses was held worthless for purposes of a deduction by the parent even though the parent continued the subsidiary in existence in order to preserve the potential for carry-forward of its accumulated net operating losses and, in fact, ultimately realized the full benefit of that potential by merging a highly profitable helicopter manufacturing corporation into it.
 

 If worthlessness were to be denied in the present ease on the bare fact that Northwest ultimately proved useful to EPNG,
 
 Textron, supra,
 
 would stand persuasively to the contrary. It does not, however, because, unlike the cruise ship subsidiary that never fulfilled the profit-making expectations that caused Textron to acquire it, Northwest was created for a different purpose. Its utility and value to EPNG did not depend on its profit-making ability. It was formed only to facilitate the mechanics of divestiture by serving as the separate repository of sufficient properties to cast it in the pre-acquisition competitive likeness of Pacific. Northwest’s capacity to fill that role was never impaired by Supreme Court edict or otherwise. It was the Court’s dissatisfaction with the quantity and mix of properties, principally gas reserves, that Northwest was to receive, not the fact that it was Northwest that was to receive them, that accounted for its rejection of the first two divestiture decrees. When those fea
 
 *714
 
 tures were appropriately adjusted in the third divestiture decree, the Court conferred its approval and Northwest discharged the function for which it was created. In these particular circumstances it cannot be said that Northwest’s stock ever became “wholly worthless” to EPNG within the meaning of the governing provisions of the Code and complementary Treasury Regulations. Thus, tax deductions in relation to EPNG’s open account advances to Northwest accrue only to the latter and are available to it to the extent that it used those monies for deductible purposes.
 

 The parties also contested before the trial judge, whether the sums advanced by EPNG to Northwest, and spent by it during the years under review, might be deductible by Northwest as ordinary and necessary business expenses under I.R.C. § 162. Northwest was a member of an affiliated group on whose behalf EPNG filed consolidated returns. The trial judge’s recommended opinion does not deal with this issue expressly, and we are not clear what his holding was. Until recently appellee’s position in litigation was that no § 162 deduction is available to a corporation not yet in business in the sense of carrying on revenue producing operations. In
 
 Blitzer
 
 v.
 
 United States,
 
 684 F.2d 874 (1982), the former Court of Claims decided that expenses before the start of revenue producing operations were deductible under § 162 if not “in the nature of start-up costs or intended to produce benefits extending beyond the year in question.” From the description given us of Northwest’s costs, we believe some at least may be allowable, and, therefore, we determine that, upon our remand, the deductibility of all of Northwest’s costs under § 162 remains to be established.
 

 IV
 

 Conclusion
 

 Should there by any items deductible by Northwest under I.R.C. § 165 rather than § 162, such items likewise remain to be established and are not dealt with herein. In summary, appellants are entitled to current deductions for all expenses incurred by EPNG during the years in suit to achieve compliance with the Supreme Court’s divestiture mandate except for (1) its open account advances to Northwest and (2) amounts spent (a) to organize Northwest and qualify it to do business, and (b) to obtain Treasury Department rulings on the income tax implications of the reorganization involving Northwest. In view of the fact that Northwest was a member of the affiliated group on whose behalf consolidated returns were filed during the years under review, appellants are also entitled to appropriate deductions for any ordinary and necessary expenses incurred by Northwest during the years under review.
 

 The judgment of the Claims Court is affirmed to the extent indicated, modified to the extent indicated, and the cause is remanded to the Claims Court for further proceedings consistent with this opinion.
 

 AFFIRMED IN PART, MODIFIED IN PART, AND REMANDED.
 

 [1]
 

 . Section 7 of the Clayton Act, 38 Stat. 731, as
 
 amended
 
 in 1950 by the Celler-Kefauver Anti-Merger Act, 64 Stat. 1125, 15 U.S.C. § 18, provides in relevant part:
 

 No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly.
 

 [2]
 

 . The El Paso Company became a plaintiff herein solely because in 1974 it became EPNG’s corporate parent by acquiring all of the latter’s capital stock.
 

 [3]
 

 . For each of the years in suit, EPNG filed a consolidated return as the common parent of an affiliated group.
 

 [4]
 

 . In August 1957, EPNG applied to the FPC for permission to acquire the assets of Pacific. That approval was granted, and, on December 31, 1959, Pacific’s corporate existence was ended by its merger into EPNG.
 

 [5]
 

 . In the interim, the Supreme Court vacated the FPC’s December 23, 1959 approval of the merger, n. 4,
 
 supra,
 
 holding that the Commission should not proceed to the merits of a decision on a merger application when there is pending in the courts a suit challenging the validity of the same transaction under the antitrust laws.
 
 California v. Federal Power Commission,
 
 369 U.S. 482, 82 S.Ct. 901, 8 L.Ed.2d 54 (1962).
 

 [6]
 

 . EPNG acquired all of Northwest’s stock for paid-in capital of $10,000.
 

 [7]
 

 . After the Supreme Court invalidated the second divestiture decree, 395 U.S. 464, 89 S.Ct. 1860, 23 L.Ed.2d 474 (1969), all Northwest stock was returned to and retained by appellants. Nonetheless, for tax purposes, Northwest remained a member of EPNG’s affiliated group. It had been included in that group throughout its existence.
 

 [8]
 

 . 410 U.S. at 962, 93 S.Ct. at 1440, 35 L.Ed.2d 697.
 

 [9]
 

 . Unless otherwise specified, all section references are to the Internal Revenue Code of 1954,
 
 as amended.
 

 § 368. Definitions Relating to Corporate Reorganizations
 

 (a) Reorganization.—
 

 (1)
 
 In general.
 
 — For purposes of parts I and II and this part, the term “reorganization” means—
 

 ******
 

 (D) a transfer by a corporation of all or a part of its assets to another corporation if immediately after the transfer the transferor, or one or more of its shareholders (including persons who were shareholders immediately before the transfer), or any combination thereof, is in control of the corporation to which the assets are transferred; but only if, in pursuance of the plan, stock or securities of the corporation to which the assets are transferred are distributed in a transaction which qualifies under sections 354, 355, or 356;
 

 ******
 

 [10]
 

 . § 355. Distribution of Stock and Securities of a controlled corporation
 

 (a)
 
 Effect on
 
 distributees.—
 

 (1)
 
 General rule.
 
 — If—
 

 (A) a corporation (referred to in this section as the “distributing corporation”)—
 

 (i) distributes to a shareholder, with respect to its stock, or
 

 (ii) distributes to a security holder, in exchange for its securities,
 

 solely stock or securities of a corporation (referred to in this section as “controlled corporation”) which it controls immediately before the distribution, _ _
 

 
 *709
 
 (B) the transaction was not used principally as a device for the distribution of the earnings and profits of the distributing corporation or the controlled corporation or both (but the mere fact that subsequent to the distribution stock of securities in one or more of such corporations are sold or exchanged by all or some of the distributees (other than pursuant to an arrangement negotiated or agreed upon prior to such distribution) shall not be construed to mean that the transaction was used principally as such a device),
 

 (C) the requirements of subsection (b) (relating to active businesses) are satisfied, and
 

 (D) as part of the distribution, the distributing corporation distributes—
 

 (i) all of the stock and securities in the controlled corporation held by it immediately before the distribution, or
 

 (ii) an amount of stock in the controlled corporation constituting control within the meaning of section 368(c), and it is established to the satisfaction of the Secretary or his delegate that the retention by the distributing corporation of stock (or stock and securities) in the controlled corporation was not in pursuance of a plan having as one of its principal purposes the avoidance of Federal income tax,
 

 then no gain or loss shall be recognized to (and no amount shall be includible in the income of) such shareholder or security holder on the receipt of such stock or securities.
 

 ******
 

 [11]
 

 . § 346. Partial Liquidation Defined
 

 (a)
 
 In general
 
 — For purposes of this sub-chapter, a distribution shall be treated as in partial liquidation of a corporation if—
 

 (1) the distribution is one of a series of distributions in redemption of all of the stock of the corporation pursuant to a plan; or
 

 (2) the distribution is not essentially equivalent to a dividend, is in redemption of a part of the stock of the corporation pursuant to a plan, and occurs within the taxable year in which the plan is adopted or within the succeeding taxable year, including (but not limited to) a distribution which meets the requirements of subsection (b).
 

 [12]
 

 . See
 
 also
 
 4A Mertens, Law
 
 of Federal Income Taxation
 
 (Rev.1979), Sec. 25.35, pp. 178-79.
 
 Estate of Meade v. Commissioner,
 
 489 F.2d 162 (5th Cir.1974) is not to the contrary. The expenses there involved were those of the shareholder-distributee, not the liquidating corporation.
 

 [13]
 

 . § 165. Losses
 

 (a)
 
 General rule.
 
 — There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.
 

 [14]
 

 . Rev.Rul. 67-125, 1967-1 Cum.Bull. 31, 32.
 

 [15]
 

 . § 165. Losses
 

 ******
 

 (g)
 
 Worthless
 
 securities.—
 

 (1)
 
 General rule.
 
 — If
 
 any security
 
 which is a capital asset
 
 becomes worthless during the taxable year,
 
 the loss resulting therefrom shall, for purposes of this subtitle, be treated as a loss from the sale or exchange, on the last day of the taxable year, of a capital asset.
 

 ♦ * * * * *
 

 (3)
 
 Securities in affiliated corporation.
 
 —For purposes of paragraph (1), any security in a corporation affiliated with a taxpayer which is a domestic corporation shall not be treated as a capital asset. For purposes of the preceding sentence, a corporation shall be treated as affiliated with the taxpayer only if—
 

 (A) at least 95 percent of each class of its stock is owned directly by the taxpayer, and
 

 (B) more than 90 percent of the aggregate of its gross receipts for all taxable years has been from sources other than royalties, rents (except rents derived from rental of properties to employees of the corporation in the ordinary course of its operation business), dividends, interest (except interest received on deferred purchase price of operating assets sold), annuities, and gains from sales of exchanges of stocks and securities. In computing gross receipts for purposes of the preceding sentence, gross receipts from sales or exchanges of stocks and securities shall be taken into account only to the extent of gains therefrom. [Emphasis supplied.]
 

 [16]
 

 . § 1.1502-14(d):
 

 ******
 

 (d)
 
 Gains and losses on obligations of members.
 
 — (1) Deferral of gain or loss. To the extent gain or loss is recognized under the Code to a member during a consolidated return year because of a sale or other disposition (other than a redemption or cancellation) of
 
 an obligation of another member
 
 (referred to in this paragraph as the “debtor member”),
 
 whether or not such obhgation is evidenced by a security,
 
 such gain or loss
 
 shall be deferred.
 
 For purposes of this paragraph, a deduction because of the worthlessness of, or a deduction for a reasonable addition to a reserve for bad debts with respect to, an obligation described in this subparagraph shall be considered a loss from the disposition of such obligation. [Emphasis supplied.]
 

 ******
 

 § 1.1502-19(b)(2):
 

 ******
 

 (2)
 
 Disposition of all shares.
 
 — Except as otherwise provided in paragraphs (d) and (e) of this section, a member shall be considered for purposes of this section as having disposed of all of its shares of stock in a subsidiary—
 

 ******
 

 (iii) On the last day of each taxable year of such subsidiary in which any of its stock is wholly worthless (within the meaning of section 165(g)), or in which an indebtedness of the subsidiary is discharged if such discharge would have resulted in “cancellation of indebtedness income” but for the insolvency of the subsidiary,
 

 ******
 

 [17]
 

 . § 1501. Privilege to File Consolidated Returns
 

 An affiliated group of corporations shall, subject to the provisions of this chapter, have the privilege of making a consolidated return with respect to the income tax imposed by chapter 1 for the taxable year in lieu of separate returns. The making of a consolidated return shall be upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. The making of a consolidated return shall be considered as such consent, in the case of a corporation which is a member of the affiliated group for a fractional part of the year, the consolidated return shall include the income of such corporation for such part of the year as it is a member of the affiliated group.