865 F.2d 255
Unpublished Disposition
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Charles E. McMANUS, III, Petitioner-Appellant,
v.
INTERNAL REVENUE SERVICE, Respondent-Appellee.
 No. 88-3015.
 United States Court of Appeals, Fourth Circuit.
 Argued: Nov. 3, 1988.
Decided: Dec. 2, 1988.
Rehearing Denied Dec. 23, 1988.
 
 Charles E. McManus, III (Charles E. McManus, III, A Professional Law Corporation, on brief), for petitioner.
 Howard M. Soloman (William S. Rose, Jr., Assistant Attorney General, U.S. Department of Justice, on brief), for respondent.
 Before WIDENER, MURNAGHAN and WILKINS, Circuit Judges.
 PER CURIAM:
 
 
 1
 Charles E. McManus, III appeals from the Tax Court's adverse decision holding him liable under his 1981 income tax return for a deficiency of $9,429.21. He had taken deductions based on his distributive share of losses from Fluid Technology, Inc. ("Fluid"), a subchapter S corporation. The Commissioner disallowed the deductions because Fluid was not yet carrying on any trade or business in 1981 nor were any research or experimental expenditures made by Fluid in connection with a trade or business. The Commissioner also denied a political contribution credit because McManus had failed to prove that he had paid it. The Tax Court affirmed the Commissioner and McManus appealed.
 
 
 2
 McManus is an attorney. In 1981, he was employed, through his professional corporation, as an associate with a law firm in Louisiana to form Fluid, a subchapter S corporation. Fluid was formed to manufacture a mud logging device[1] which was developed by D.W. Sanderford, an inventor. Sanderford wanted to develop ten prototypes and test them on oil drills, but he needed to raise money to complete the final stages of the development. Sanderford, his brother and a partner in McManus' law firm decided to create Fluid to build ten prototypes and to perform the research and development necessary for their success. Fluid was to receive rental income from the units.
 
 
 3
 McManus set up Fluid in the following manner. Fluid was incorporated in Louisiana on November 11, 1981, and it elected subchapter S corporation treatment on December 16, 1981. Fluid was capitalized entirely with cash contributions of one dollar per share from McManus and 12 other investors, who held a total of 262,000 shares. On December 16, 1981, 212,000 shares were subscribed; the remaining 50,000 were subscribed on December 29, 1981.
 
 
 4
 On December 2, 1981, Fluid entered into four contracts: (a) a License Agreement with Cybar Corporation ("Cybar");[2] (2) a Research and Development Contract with Cybar; (3) a Custom Manufacturing Contract with Eufex, Inc. ("Eufex");[3] and (4) a Maintenance Agreement with Eufex. The four contracts became effective on December 16, 1981, when two-thirds of the offered shares in Fluid were sold.
 
 The Tax Court found that the
 
 5
 end result of the four contracts was to create a circular arrangement whereby Fluid Technology was required to do nothing but make payments to Cybar and Eufex. Eufex was to acquire component parts, manufacture the prototype mud logging devices and maintain them for one year following delivery. Cybar was to perform all research and development, including testing the component parts that Eufex delivered to Fluid Technology before Eufex assembled the devices. Fluid Technology also acquired no rights in any new technology developed pursuant to the contracts. The Custom Manufacturing Contract, Maintenance Agreement and Research and Development Contract each provide that all new, developmental, and improvement patents arising from the contracts will be the "exclusive property of Fluid and its licensor." The License Agreement, however, provides that "All new, developmental, and improvement patents arising from Fluid's efforts pursuant to this Agreement will be the exclusive property of Cybar," Fluid Technology's licensor. The only right that Fluid Technology acquired pursuant to its agreements with Cybar and Eufex (aside from the right to merge into Cybar) was the right to keep and rent out 10 mud logging devices provided that Cybar and Eufex completed them during the license period [to end on June 30, 1983] and provided that Cybar did not exercise its option under the License Agreement to purchase the devices from Fluid Technology at cost.
 
 
 6
 On December 16, 1981, Fluid paid $45,000 to Eufex pursuant to the Maintenance Agreement and $157,000 to Cybar pursuant to the Research and Development Contract. Fluid deducted those amounts as expenses on its 1981 income tax return. No mud logging devices were delivered to Fluid during the 18 to 19 month license period. Accordingly, no maintenance work was performed in 1981 and no rental income was received.
 
 
 7
 Fluid also claimed a depreciation deduction of $1,977.65 on its 1981 return representing one month's depreciation on 5-year recovery property placed in service[4] in December 1981 with a cost basis of $158,212.20. Fluid made four progress payments, totaling $31,642.44, to Eufex in 1981 or 20 percent of the amount invoiced under the Custom Manufacturing Contract for components and materials delivered.
 
 
 8
 Fluid also deducted $10.00 which represented the corporate franchise tax which it paid to the Louisiana Department of Revenue and Taxation on December 31, 1981. Finally, Fluid claimed an amortization deduction of $8.20 as an organizational expense amortizable over 60 months and $1,128.67 in legal fees.
 
 
 9
 Although Fluid anticipated that the prototype mud logging devices would be operational by March of 1982 and each would generate between $500.00 and $2,000.00 per day in rental receipts, problems with the necessary computer technology arose.[5] As a result, no mud logging devices were operational during the licensing period which expired on June 30, 1983 and no rent was generated during that time.[6]
 
 
 10
 In summary, Fluid filed its 1981, initial tax return showing no income and a loss of $205,124.52. McManus claimed an investment tax credit on his 1981 return of $1,086.96, based on new recovery property with an other than three year recovery period and an unadjusted basis of $10,869.54. McManus also claimed a political contribution credit of $50.00 for a contribution of $740.00 made by his law firm to the law firm's political action committee and charged to McManus' professional corporation.[7]
 
 
 11
 The first question for discussion is whether the Tax Court erred in finding that Fluid was not carrying on any trade or business in 1981 in order to deduct expenses under 26 U.S.C. Sec. 162.
 
 
 12
 Section 162 allows a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business...." To qualify as a Sec. 162 deduction, an item must "(1) be 'paid or incurred during the taxable year,' (2) be for 'carrying on any trade or business,' (3) be an 'expense,' (4) be a 'necessary' expense, and (5) be an 'ordinary' expense." Commissioner v. Lincoln Savings & Loan Association, 403 U.S. 345, 352 (1971). Whether a taxpayer is engaged in a trade or business requires an examination of all of the relevant facts. Commissioner v. Groetzinger, 480 U.S. 23, 36 (1987); Richmond Television Corp. v. United States, 345 F.2d 901, 905 (4th Cir.), vacated on other grounds, 382 U.S. 68 (1965) (per curiam).
 
 
 13
 The Tax Court found that the taxpayer failed to prove the second of those requirements.
 
 
 14
 The law in this Court, as in many of the other circuits,[8] is that pre-opening or start-up expenses incurred between the decision to establish a business and the actual beginning of business operations are not deductible under Sec. 162. Richmond Television, supra, at 907. See also Johnsen v. Commissioner, 794 F.2d 1157, 1160 (6th Cir.1986); Aboussie v. United States, 779 F.2d 424, 428 (8th Cir.1985); Central Texas Savings & Loan Association v. United States, 731 F.2d 1181, 1183 (5th Cir.1984); Madison Gas & Electric Co. v. Commissioner, 633 F.2d 512, 517 (7th Cir.1980); Goodwin v. Commissioner, 75 T.C. 424, 433 (1980), aff'd without published opinion, 691 F.2d 490 (3rd Cir.1982). The business must have "begun to function as a going concern and perform[ ] those activities for which it was organized." Richmond Television, supra.
 
 
 15
 The Tax Court found that Fluid had not commenced business operations in 1981 nor was it in a position to do so. The Tax Court based its determination on the following facts: (1) only some of the component parts of the devices were received by Fluid in 1981; (2) the component parts had to be tested before assemblage and Cybar, not Fluid, was required to perform all research and testing under the contracts; and (3) until the merger of Fluid into Cybar, Fluid performed no work except for paying Cybar and Eufex. Fluid also had no rights other than to receive rental income from the devices, none of which was assembled by Cybar and Eufex during the licensing period.
 
 
 16
 There is no contention by McManus that the findings of the Tax Court are clearly erroneous. The appeal addresses only the conclusion of the Tax Court under the applicable law. It is argued that the Tax Court ignored case law and particular Revenue Rulings upon which the taxpayer relied to structure Fluid so that it would be carrying on business in 1981. However, the issue in the cases cited by McManus turned on whether an activity whose conduct was in issue was a business, i.e., was there a profit motive. The issue was not when the activity commenced, i.e., the "carrying on" requirement of Sec. 162.[9]
 
 
 17
 Taxpayer's reliance on the Revenue Rulings is similarly misplaced.[10] The issue in the rulings was which year the deduction for intangible drilling and development costs could be taken. The issue was not whether the expenses had been incurred in "carrying on a trade or business" as that was undisputed. Therefore, the assertion that Fluid began operations on December 16, 1981 when the "turnkey" contracts became effective must be rejected as the Tax Court findings are not contested and it applied the law in the Fourth Circuit under Richmond.
 
 
 18
 The next question is whether the Tax Court erred in finding that Fluid's research and experimental expenditures were not "in connection with" a trade or business in order to deduct them under 26 U.S.C. Sec. 174.
 
 
 19
 Section 174(a)(1) provides that a "taxpayer may treat research and experimental expenditures which are paid or incurred by him during the taxable year in connection with his trade or business as expenses which are not chargeable to capital account. The expenditure so treated shall be allowed as a deduction." 26 U.S.C. Sec. 174(a)(1).
 
 
 20
 McManus does not challenge the Tax Court's finding regarding the relationship of the various contracts. However, McManus argues that the Tax Court did not follow Snow v. Commissioner, 416 U.S. 500 (1974), which interpreted the "in connection with" language of Sec. 174 more liberally than the "carrying on a trade or business" language found in Sec. 162. In applying the "in connection with" language, the Supreme Court held that it was not necessary for a taxpayer claiming deductions under Sec. 174 to have commenced its trade or business in the year of the deduction.[11]
 
 
 21
 There is subsequent case law which clearly holds that "taxpayer must still be engaged in a trade or business at some time...." Green v. Commissioner, 83 T.C. 667, 686-87 (1984).[12] Whether the taxpayer's activities in connection with a product are sufficiently substantial and regular to constitute a trade or business for purposes of Sec. 174 is a factual determination. Id.
 
 
 22
 McManus fails to argue that any facts determined by the Tax Court were clearly erroneous. Because the Tax Court found that Fluid never began business (prior to its merger into Cybar), it upheld the Commissioner's determination that the deduction should be disallowed.[13]
 
 
 23
 We turn to the question of whether the Tax Court erred in finding that the component parts delivered to Fluid were not "placed in service" for depreciation purposes pursuant to 26 U.S.C. Sec. 167.
 
 
 24
 The alternative contention is made that component parts received by Fluid were assets placed into service for which a depreciation deduction should be allowed.[14] The invoices issued by Eufex to Fluid were each in the amount of the costs of the delivered components plus overhead in the amount of 150 percent of cost. Fluid made progress payments in the amount of $31,642.44 or 20 percent in December 1981. Fluid claims a depreciation deduction of $1,977.65 for one month's depreciation on five-year recovery property placed in service in December 1981 with a cost basis of $158,212.20.
 
 
 25
 Section 167(a) allows such depreciation deductions for property "used in the trade or business." The Treasury Regulations provide that the period of depreciation begins when the asset is placed in service. 26 C.F.R. Sec. 1.167(a)-10(b).
 
 
 26
 The Tax Court found that even if component parts could be treated as assets, the component parts were still not "placed in service" since they were not in a "state of readiness and availability for a specifically assigned function,"[15] i.e., to be used in either manufacturing of or rental of mud logging prototypes. McManus claims that the component parts were placed in service when they entered the research and development stage for testing. However, as the Tax Court found, Fluid had no role in either the research and testing or the manufacture of the devices.
 
 
 27
 Finally, we must look to see whether the Tax Court erred in finding that McManus was not entitled to a tax credit for a contribution made to a political candidate for public office.
 
 
 28
 Section 24(a) (formerly Sec. 41) provides that "in the case of an individual, there shall be allowed subject to the limitations of subsection (b) [not to exceed $50], as a credit against the tax imposed by this chapter for the taxable year, an amount equal to one-half of all political contributions and all newsletter fund contributions, payment of which is made by the taxpayer within the taxable year." 26 U.S.C. Sec. 24(a) (repealed Oct. 22, 1986).
 
 
 29
 McManus claimed a credit for $50.00 because the law firm of which McManus' professional corporation was an employee made a contribution of $740.00 to its political action committee which it charged to the professional corporation of McManus. The Tax Court held that McManus failed to meet his burden of showing that the contribution was made on behalf of himself and not his professional corporation.
 
 
 30
 McManus now claims that the burden should not have been placed on him because the Notice of Deficiency used ambiguous language when informing McManus that the $50.00 credit was disallowed.[16] The Commissioner's brief points out, however, that the parties stipulated prior to trial that the credit was disallowed in the Notice of Deficiency.[17]
 
 
 31
 Since the findings of the Tax Court are not challenged and the Tax Court correctly applied the law, the Tax Court's decision is
 
 
 32
 AFFIRMED.
 
 
 
 [1]
 A mud logging device or pressure translator monitors critical drilling parameters on an oil well while the well is being drilled. In this way the rock and mud are analyzed on the spot to determine the probability of oil. Before this invention, analyses had to be done off-site at a laboratory
 
 
 [2]
 Cybar is a Texas corporation of which Sanderford is the president and majority shareholder
 
 
 [3]
 Eufex is a Texas corporation which is a wholly-owned subsidiary of Cybar
 
 
 [4]
 The property placed in service in 1981 consisted of the component parts of mud logging devices that Eufex delivered in December 1981
 
 
 [5]
 Cybar failed to develop a computer capable of receiving pneumatic signals from pressure translators located in various places on a drilling rig, converting the information into a signal that could be read on a computer screen, and making calculations to enable a drilling rig operator to analyze the mud removed from the drill hold
 
 
 [6]
 Fluid elected to merge into Cybar at the end of the licensing period. Since then, Cybar has placed two devices on drilling rigs in the Gulf of Mexico. However, more capital is needed before any more devices can be placed in operation
 
 
 [7]
 The law firm made the payment and deducted it from the salary paid to McManus' professional corporation
 
 
 [8]
 As the Tax Court points out, the Court of Claims and its successor the Court of Appeals for the Federal Circuit are to the contrary. They have taken the position that certain recurring expenses necessary to maintain any business enterprise are deductible under Sec. 162 even if incurred before the business is in a position to earn income. El Paso Co. v. United States, 694 F.2d 703, 714 (Fed.Cir.1982); Blitzer v. United States, 684 F.2d 874, 880 (Ct.Cl.1982)
 
 
 [9]
 Blitzer, supra, as heretofore noted, is not the law in the Fourth Circuit
 
 
 [10]
 Rev.Rul. 170, 1953-2 C.B. 141 was revoked by Rev.Rul. 71-252, 1971-1 C.B. 146
 
 
 [11]
 The argument is that the only difference between Snow and the case now before us is that the invention in Snow was successful while the mud logging device has yet to, and may never, become successful. However, that analysis ignores the fact that the taxpayer in Snow had an ownership interest in the invention, through the partnership, while Fluid has no equivalent ownership interest here. Its limited right to receive rent during the licensing period is greatly attenuated by both the fact that it had to rely on Cybar and Eufex first to develop and manufacture the devices and the fact that Cybar could always opt to purchase the devices at cost from Fluid during the licensing period
 
 
 [12]
 See also Levin v. Commissioner, 87 T.C. 698, 724 (1986), aff'd, 832 F.2d 403 (7th Cir.1987); Drobny v. Commissioner, 86 T.C. 1326, 1340 (1986)
 
 
 [13]
 The contracts actually precluded Fluid from becoming a trade or business since it had no obligations other than to make payments or any rights other than a highly dubious, never realized opportunity to receive rent should both Cybar and Eufex complete the devices. See supra note 11
 Furthermore, the only business in which Fluid might have been engaged would have been marketing the devices to develop rental situations for itself, a highly unlikely eventuality given Fluid's attenuated right to rent. No facts have been adduced to show that Fluid was engaged in any business.
 
 
 [14]
 McManus claimed an investment tax credit under 26 U.S.C. Sec. 38 for his investment in certain depreciable property. However, 26 U.S.C. Sec. 48(a) provides that Sec. 38 property credits cannot be taken unless the deduction for depreciation (by Fluid under Sec. 167) is allowable for the taxable year
 
 
 [15]
 See 26 C.F.R. Sec. 1.46-3(d)(1)(ii)
 
 
 [16]
 The Notice read: "We adjusted your political contributions credit as a result of changes to your federal income tax." McManus argues that because political contributions are not "adjusted" as a result of changes in taxable income, such as is the case with medical deductions, he was without notice that there was a problem with his claim for $50.00 for the political contribution
 
 
 [17]
 The Notice was received prior to the filing of taxpayer's petition